MEDALLION HOMES, INC., Appellant,

v.

THERMAR INVESTMENTS, INC., et
al, Appellees.

No. A14–85–070–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

Sept. 19, 1985.

Foster Wooten, Pro Se of Houston.

Stephen E. Ulrich, Russell T. Van Keuren, James McIver, Houston, for appellant.

Mary Ann Starks, Houston, for appellees.

Before J. CURTISS BROWN, C.J., and SEARS and ELLIS, JJ.

## OPINION

SEARS, Justice.

Appellant, Medallion Homes, Inc., sued Thermar Investments, Inc., T.C. Simmons, C. Foster Wooten, Inc., and C. Foster Wooten for damages resulting from an alleged breach of contract to sell real property and for violations of the Texas Deceptive Trade Practices Act (DTPA), Tex.Bus. & Com. Code Ann. §§ 17.41–17.63 (Vernon Supp. 1985). A jury was waived, and the trial court found that appellee Thermar Investments, Inc. breached its contract with appellant and awarded appellant $30,000.00 in damages and $10,000.00 in attorney's fees. No liability was imposed on T.C. Simmons, Individually, or on C. Foster Wooten, Inc. C. Foster Wooten, Individually, was dismissed by agreement. We affirm.

In early 1982, First City National Bank of Houston (First City) acquired substantially all of a residential subdivision in Northwest Harris County known as Quail

Forest. At about the same time, C. Foster Wooten, President of C. Foster Wooten, Inc., (Wooten, Inc.), began making plans to develop the subdivision. Because he lacked the financial strength to develop the subdivision, Wooten contacted T.C. Simmons, President of Thermar Investments, Inc. (Thermar), and told him of the availability of the lots. Simmons contacted First City, and they agreed that Thermar could purchase the lots. On July 8, 1982, Thermar signed a contract of sale, granting Thermar the right to purchase and resell specified lots in Quail Forest, and presented the contract to First City for execution. The agreement provided that Thermar could not assign the contract without the prior written consent of First City. However, Thermar and Wooten, Inc., in expectation of First City's approval, executed a document on July 8, 1982, which purported to assign to Wooten, Inc. an undivided one-half interest in Thermar's contract. On July 15, First City executed the contract of sale with Thermar but did not approve Thermar's assignment to Wooten, Inc. Therefore, pursuant to the terms of the contract, Thermar's purported assignment to Wooten, Inc. had no validity.

On January 21, 1983, Thermar and Medallion Homes, Inc. (Medallion) executed a contract of sale which provided for the conveyance to Medallion of twenty-one lots in the subdivision on a "take-down" schedule. The terms of the contract provided that Medallion purchase one lot in Section 1 and twenty lots in Section 2 at the rate of five lots every six months. Thermar was obligated to convey marketable title at the time of closing. Pursuant to the contract, Medallion "took down" four lots and paid Thermar for them in February, 1983. Medallion built and sold houses on each of the four lots. Thermar then paid Wooten, Inc. a "commission" of $500.00 per lot from the profits of Medallion's purchase. When Wooten did not receive the expected one-half interest, he recorded the July 8 "assignment" in the real property records of Harris County on March 23, 1983. Pursuant to its contract, Medallion attempted to purchase two more lots from Thermar in April. However, Medallion's title company refused to issue an owner's title policy because the recordation of the assignment between Thermar and Wooten, Inc. clouded title to the lots Thermar was to convey.

The contract of sale between First City and Thermar was terminated by agreement soon thereafter. Mac-Carey Properties, Inc. (Mac-Carey) then purchased the Quail Forest subdivision, and Medallion subsequently purchased twelve lots from Mac-Carey at an increase in price of $2,500.00 per lot.

At trial, the court found Thermar had breached its contract with Medallion and fixed damages at $30,000.00, plus attorney's fees. The $30,000.00 represented the increase in price Medallion was required to pay Mac-Carey for the twelve lots.

Appellant argues in its first point of error that the trial court erred in failing to find Thermar breached an implied warranty of title by conveying property it did not own. According to appellant, this breach of warranty is actionable under Section 17.-50(a)(2) of the DTPA, which provides that a consumer may maintain an action if the breach of an express or implied warranty is a producing cause of actual damages. Appellant further argues that Thermar's breach was knowing, and a trebling of damages is therefore permitted under Section 17.50(b)(1) of the Act.

Although the DTPA applies to the breach of an implied warranty of title, *Holifield v. Coronado Building, Inc.*, 594 S.W.2d 214 (Tex.Civ.App.—Houston [14th Dist.] 1980, no writ), we find no such breach. First City's ownership of the subdivision was recorded in the Real Property Records of Harris County as of October, 1982. This recordation is constructive notice to all persons that First City was the owner of the lots in question. Tex.Prop. Code Ann. § 13.002 (Vernon Supp.1984). The constructive notice provided by a recording statute is a defense to an action under the DTPA. *Jernigan v. Page*, 662 S.W.2d 760 (Tex.App.—Corpus Christi 1983, writ ref'd n.r.e.).

■ Furthermore, there is evidence that Medallion had actual notice that First City, not Thermar, was the owner of the lots at the time Medallion and Thermar entered into their agreement. The lots were conveyed to Medallion and other builders at simultaneous closings where First City (through the Mischer Corporation) sold the lots to Thermar, who then reconveyed to Medallion. Also, during contract negotiations with Medallion, Thermar's representative indicated that because of Thermar's contract with First City, certain provisions of the Medallion contract were dictated by and required to be consistent with the terms of the Thermar/First City agreement. Additionally, a provision of the contract between Thermar and Medallion incorporated by reference a copy of the recorded subdivision plat which prominently depicts First City as the owner. This evidence was sufficient for the court below to find that Medallion had actual knowledge of First City's ownership.

■ Medallion contends, however, that the purported partial assignment from Thermar to Wooten, Inc. created a cloud on the title to the lots, thereby causing a breach of the implied warranty of marketability. A title is not marketable if clouded by any outstanding contract, covenant, interest, lien, or mortgage sufficient to form a basis of litigation, or if it exposes its holder to a reasonable probability of litigation with the least chance of defeat. *Ryan Mortgage Investors v. Fleming-Wood*, 650 S.W.2d 928, 936 (Tex.App.—Fort Worth 1983, writ ref'd n.r.e.). Further, the law implies with respect to executory contracts for the sale of land that the seller will furnish the buyer good and marketable title, absent any provision in the contract to the contrary. *Tiffany Development Corp. v. Cangelosi*, 514 S.W.2d 321, 324 (Tex.Civ. App.—Houston [1st Dist.] 1974, no writ). However, a title need not be absolutely free from every technical and possible suspicion to be marketable. *Lund v. Emerson*, 204 S.W.2d 639, 641 (Tex.Civ.App.— Amarillo 1947, no writ). The mere possibility of a defect which has no probable basis

according to ordinary experience does not show an unmarketable title. *Id.*

■ There is no evidence that Thermar had prior knowledge of, or was in any way responsible for, Wooten's recording of the invalid "assignment." As was previously stated, the purported assignment between Thermar and Wooten, Inc. required the joinder and approval of First City. However, First City did not approve the assignment, and all the parties to the instrument testified that it never became effective. Obviously, Thermar has no duty to inform Medallion of the existence of an invalid assignment. Further, there was evidence that at least one other title company would have issued a title policy under these circumstances. Appellant's first point of error is overruled.

■ In its second point of error, Medallion contends that the trial court erred in failing to hold T.C. Simmons liable for fraudulent acts performed in his capacity as president of Thermar. Medallion correctly states the general rule that corporate agents are individually liable for fraudulent or tortious acts committed while in the service of their corporation. *Light v. Wilson*, 663 S.W.2d 813 (Tex.1983); *Wheeler v. Box*, 671 S.W.2d 75 (Tex.App.—Dallas 1984, no writ); *Wagner v. Morris*, 658 S.W.2d 230 (Tex.App.—Houston [1st Dist.] 1983, no writ). The act Medallion complains of is Simmons' signing the contract of sale to Medallion with the knowledge that Thermar lacked title and that Wooten, Inc. claimed an interest in the subdivision. However, Simmons signed as president of Thermar. There is no evidence that Simmons acted in his individual capacity at any time. Further, we have not found the act complained of constituted fraud. Point of error two is overruled.

■ Our reasoning in overruling Medallion's second point of error applies with equal force to its fourth point. Medallion urges that Thermar violated Section 17.-46(b)(23) of the DTPA for the same reasons alleged in point of error two. Given Medallion's actual and constructive notice of own-

ership of the lots and the invalidity of the assignment to Wooten, Inc., there is no evidence that Thermar failed to disclose any material information or fraudulently induced Medallion to execute a contract. We therefore overrule appellant's fourth point of error.

Medallion claims in its third point of error that the trial court erred in failing to find the existence of a partnership between Thermar and Wooten, Inc. A partnership is defined as "an association of two or more persons to carry on as co-owners a business for profit." Tex.Rev.Civ.Stat. Ann. art. 6132b, § 6(1) (Vernon 1970). The intention of the parties is an important factor in determining the existence of a partnership. *Coastal Plains Development Corp. v. Micrea, Inc.*, 572 S.W.2d 285 (Tex. 1978). Also considered are agreements to share profits and losses, community of interest and a mutual right of control or management. *Guitierrez v. Yancy*, 650 S.W.2d 169 (Tex.App.—San Antonio 1983, no writ); *Tex-Co Grain Co. v. Happy Wheat Growers, Inc.*, 542 S.W.2d 934 (Tex. Civ.App.—Amarillo 1976, no writ); *Davis v. Gilmore*, 244 S.W.2d 671 (Tex.Civ.App.— San Antonio 1951, writ ref'd). The trial court found that a partnership did not exist. If there is some substantial and probative evidence to support the determination that a partnership did not exist, that finding will not be set aside merely because the court could have drawn different inferences and conclusions from the evidence. *Guitierrez v. Yancy*, 650 S.W.2d at 172.

The evidence in this case indicates that Thermar and Wooten, Inc. intended to form a partnership, but that intention was defeated when First City failed to approve the assignment. Since that assignment was invalid, Thermar and Wooten, Inc. had nothing on which to base a partnership. Thermar's payment to Wooten, Inc. of $500.00 per lot as a "commission" could have been construed by the court as a sharing of profits, but it was not so construed. Since there is some probative evidence that the payment was in fact a commission, we will not set aside the court's finding. We overrule appellant's third point of error.

Appellant urges in its final point of error that the trial court erred by failing to find Medallion sustained consequential damages as a result of Thermar's breach of contract. To be recoverable, consequential damages must have been reasonably contemplated and foreseen by the parties at the time they entered into the contract. *Whiteside v. Trentman*, 141 Tex. 46, 170 S.W.2d 195 (1943). Uncertainty as to the fact of consequential damages, as opposed to their amount, is fatal to their recovery. *McKnight v. Hill & Hill Exterminators, Inc.*, 689 S.W.2d 206 (Tex.1985).

Medallion claims that it sustained $50,000.00 in consequential damages because of Thermar's inability to sell twenty lots in addition to the original twenty-one. Another $17,996.94 in damages is claimed to be sustained because Medallion was forced to spread fixed overhead costs over four houses, rather than the six it would have had if Medallion could have purchased the lots it was required to in April, May and June, 1983. Finally, Medallion claims the $5,000.00 in earnest money it forfeited to Mac-Carey should also be considered consequential damages, because it was within the contemplation of Thermar and Medallion at the time they entered into their contract. We find no merit to these arguments. The fifth point of error is overruled.

Having found no error, we affirm the judgment of the trial court.