RIO GRANDE LAND & CATTLE COM-
PANY, Lee Bowen, Bob Rebholtz, Rich
Hormaechea, and Robert Hayes, Appel-
lants,

v.

George E. LIGHT III, K.L. Cattle Co.
and K.L. Bar Cattle Co., Appellees.

No. 04–86–00482–CV.

Court of Appeals of Texas,
San Antonio.

March 30, 1988.

Rehearing Denied April 28, 1988.

John M. Pinckney, III, Judith R. Blakeway, Matthews & Branscomb, San Antonio, for appellants.

C.R. Kit Bramblett, Bramblett & Bramblett, El Paso, Walter Park, IV, San Antonio, for appellees.

Before CADENA, C.J., and CANTU and REEVES, JJ.

## OPINION

REEVES, Justice.

This appeal involves the operations of a cattle feed lot. In the fall of 1979 and the spring of 1980, George E. Light III, Dan Kinsel Jr., K.L. Cattle Co., and K.L. Bar Cattle Co. (the plaintiffs)[1] sent several thousand head of cattle to be fed for sale to Rio Grande Land and Cattle Co., a Texas corporation. Rio Grande was owned by four individuals: Lee Bowen, Bob Rebholtz, Rich Hormaechea, and Robert Hayes. After the plaintiffs' animals were fed and sold, the plaintiffs were billed for the feed and services rendered to their

animals by Rio Grande. The amount the plaintiffs were billed was substantially more than they expected.

The plaintiffs filed suit against Rio Grande and the individual defendants. A jury found that Rio Grande intentionally overcharged the plaintiffs for rations and baled hay and intentionally misweighed cattle belonging to them at receipt and sale. The jury also found that the acts committed by Rio Grande were a proximate cause of the plaintiffs' damages.

The jury found for the plaintiffs and awarded actual and punitive damages. The jury further found that Bowen, Rebholtz, Hormaechea, and Hayes had instructed the employees of Rio Grande, with the design and for the purpose of injuring the plaintiffs, to perform the fraudulent acts it found Rio Grande committed.

Based on the jury's findings, the trial court ordered the defendants held jointly and severally liable for the damages found by the jury. It also ordered that the plaintiffs recover pre-judgment interest at a rate of six percent per annum.

We summarize the defendants' points of error as follows:

1. there was insufficient evidence proffered to prove the alleged allegations of misconduct;

2. exemplary damages were improperly awarded because the plaintiffs' cause of action sounded in contract rather than tort;

3. the charge to the jury did not connect each act of alleged misconduct submitted to a separate and corresponding question of damages, making it impossible to determine the damages attributed to that act of misconduct;

4. there was insufficient evidence proffered to prove the actual damage award;

5. the plaintiffs' damages witness was not qualified to testify as to the damages;

6. there were no pleadings to support the individual liability of the defendants; and

---

1. K.L. Cattle and K.L. Bar are both owned by members of the Light and Kinsel families.

7. there was insufficient evidence proffered to establish the personal liability of Rio Grande's officers.

The plaintiffs complain on a cross point that the trial court erred in not awarding prejudgment interest at the rate of ten percent.

## FACTS AND SUFFICIENCY OF THE EVIDENCE OF MISCONDUCT

■ Rio Grande was formed in November 1977 by the four individual defendants to take advantage of an offer made to them by a bank that had foreclosed on a feed lot located in Eagle Pass. The individual defendants put up a total of $10,000 of their own money and received a $7,000,000 line of credit from the forecloser bank. Each defendant also served as an officer and a director of Rio Grande.

Hayes managed the feed lot on a day-to-day basis. The other defendants kept in touch with Hayes by telephone and had directors' meetings on a monthly basis.

Feed lots are used by cattle producers to rapidly increase the weight of cattle in the months just prior to the time they are sold for slaughter. Animals are weighed on receipt, given several quasi-medical treatments (checked and dipped for tics, sprayed with insecticide, and given hormone treatments), tagged with lot numbers, and put in pens where they are segregated from animals belonging to other cattle producers.

The cattle kept at feed lots are given water and as much feed, a mixture of hay and grain-derived products ("rations"), as they will eat. The amount of feed given to each lot of animals is measured and recorded. Cattle do not respond equally to a given diet. Hereditary factors, sickness, prior diet, and the quality of services rendered in a feed lot affect how well a particular animal will do in lot feeding.

Animals from a particular pen are only removed from their fellows if they die (their body gets buried), get sick (there is a "hospital" pen where they are treated), or cause disruptions in the pens (some steers apparently produce the odor of a cow in heat).

Cattle are sold when: (1) they reach a marketable weight, or (2) it appears that they are not responding to lot feeding by gaining the expected amount of weight.

One way for a cattle producer to determine how well a particular lot of his cattle performed in a particular feed lot is the cost of gain method. The producer first determines the difference between the starting weight of all the animals taken to the feed lot and the weight of all the animals sold from that group.[2] That difference reflects the total amount of weight gained by the cattle producer's animals at the lot. To determine the cost of gain, the total amount charged by a feed lot in connection with a particular group of animals is divided by the total amount of weight gained by the animals in the group. The resulting figure is the cost per pound of weight gained and sold. The cost of gain is reported as a cents per pound figure (c/lb).

In the fall of 1979 and the spring of 1980, the plaintiffs kept several thousand head of cattle at Rio Grande. When the plaintiffs examined their cost of gain figures for the cattle they kept at the defendants' lot they immediately believed that they had been defrauded. They expected, and apparently there was a representation to that effect by Rio Grande, that their cost of gain would fall in the mid to low 50 c/lb range. Instead, the cost of gain for the Light cattle was 66.78 c/lb, for the K.L. Cattle cattle it was 73.91 c/lb, and for the K.L. Bar cattle it was 82.86 c/lb. In contrast, the cost of gain for 2,329 head of cattle owned by the defendants and fed at Rio Grande at about the same time the plaintiffs' cattle were

**2.** Rio Grande provided the plaintiffs with the total starting and finishing weights of their cattle. Apparently, it is the industry standard for a cattle producer to rely on the weights provided by feed lot operators. The weighing of their cattle by cattle producers upon shipment to a feed lot appeared, from the record, to be difficult. The weighing by the producers of their cattle at sale appeared impractical or impossible.

fed there was 55.16 c/lb.[3]

Harry Lee Kelly, a foreman at Rio Grande, worked at Rio Grande before, during, and after the time the plaintiffs had cattle fed there. He stated that he misreported, at the direction of Roger Rodarte (his immediate supervisor), the death of animals belonging to the plaintiffs. He also testified that, after being ordered to by Rodarte, he misweighed cattle belonging to the plaintiffs at receipt and at sale, overreported the amount of hay given to the animals owned by the plaintiffs, and switched lighter for heavier cattle found in the plaintiffs' pens. Kelly further testified that he observed Rodarte overreporting the amount of feed given to cattle kept at Rio Grande.

Rodarte denied that he committed or ordered such acts. Other employees, who, according to the evidence, would have known of the commission of any wrongful acts by Rodarte, testified that they knew of none. Accountants hired by the defense to audit Rio Grande's books testified that they could find no evidence of any wrongful acts occurring at the feed lot, but if there was wrongdoing occurring at Rio Grande, then everyone working there had to have known about it.

The defendants attack the jury's findings that Rio Grande overcharged the plaintiffs for rations and hay and misweighed their cattle at receipt and sale on insufficient evidence grounds. In reviewing a jury's findings of fact, a court of appeals may only substitute its judgment for the jury's if, in light of the evidence presented to the jury, the jury's findings were manifestly unjust. *See In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951). Here, there was sufficient evidence to support the jury's findings concerning the misweighing of cattle and the padding of feed bills by Rio Grande against the cattle owned by the plaintiffs. There is also sufficient evidence that this was done inten-

3. It was contested whether the defendants' animals were of similar quality to those owned by the plaintiffs.

4. The defendants also raised no evidence points of error concerning several of the jury's findings

tionally and was the proximate cause of the plaintiffs' damages.[4]

## TORT OR CONTRACT ACTION?

We must now determine whether this case involves an action based on tort or one based on contract. The plaintiffs argue that their cause of action sounded in tort; the defendants argue that it sounded in contract. In *Jim Walter Homes v. Reed*, 711 S.W.2d 617, 617–618 (Tex.1986) it was stated:

Although the principles of contract and tort causes of action are well settled, often it is difficult in practice to determine the type of action that is brought. We must look to the substance of the cause of action and not necessarily the manner in which it was pleaded.

The contractual relationship of the parties may create duties under both contract and tort law. The acts of a party may breach duties in tort or contract alone or simultaneously in both. The nature of the injury most often determines which duty or duties are breached. *When the injury is only the economic loss to the subject of a contract itself, the action sounds in contract alone.* (Emphasis added; citations omitted).

The relationship between the parties was based on the plaintiffs paying for the feed actually given to their animals and that the defendants properly weigh them on receipt and sale in order to allow a correct computation of the cost of gain. The question related to the acts of misconduct asked if Rio Grande committed any of the following acts, if they were done intentionally, and if they were the proximate cause of damages to the plaintiffs:

1. Overcharging the plaintiffs on feed bills for rations.

2. Overcharging the plaintiffs on feed bills for baled hay.

related to the acts committed by Rio Grande on the plaintiffs' cattle. Because we find there was sufficient evidence to support the findings, we overrule the defendants' no evidence points.

3. Falsifying death records on cattle owned by the plaintiffs.
4. Substituting weaker, lighter, lower quality cattle for cattle belonging to the plaintiffs.
5. Misweighing cattle belonging to the plaintiffs at receipt.
6. Misweighing cattle belonging to the plaintiffs at sale.
7. Shipping cattle owned by the plaintiffs without paying for them.

The questions concerning the misreporting of the amount of feed given to the plaintiffs' animals and the misreporting of their weight concerned a breach of the contractual relationship between the parties because those questions went to the basis of the business dealings between the parties. The other questions were ones of tort because they allege what was, in effect, conversions of the plaintiffs' property by the defendants. The plaintiffs' questions show, therefore, that they complained that: (1) the defendants breached their contractual relationship with them, and (2) the defendants committed tortious acts against them.

The jury found that Rio Grande: (1) overcharged the plaintiffs for rations and baled hay, and (2) misweighed the plaintiffs' cattle at receipt and sale. The jury did not find Rio Grande: (1) falsified death records on the plaintiffs' cattle, (2) substituted weaker, lighter, and lower quality cattle for the plaintiffs', and (3) shipped cattle belonging to the plaintiffs without paying for them.

Since the jury affirmatively answered the questions related to the contractual relationship between the plaintiffs and Rio Grande, it found that Rio Grande breached its contractual duties to the plaintiffs. Since the jury failed to find that the alleged tortious acts of misconduct occurred, it found that Rio Grande committed no tort against the plaintiffs. Looking at the substance, not form, of the jury's findings and the trial court's judgment, we find that the plaintiffs pleaded and sought findings of breaches of contract and of independent torts. Since the jury found the breaches of contract but not the commission of the torts, we hold that the nature of the cause before us now is for breach of contract.

■ This distinction is important because it controls whether the trial court correctly awarded exemplary damages to the plaintiffs. Exemplary damages may not be recovered for breaches of contract. *Jim Walter Homes v. Reed*, 711 S.W.2d at 618. Even if a breach of contract was malicious, intentional, or capricious, exemplary damages may not be recovered unless a distinct tort was alleged and proved. *Amoco Production Co. v. Alexander*, 622 S.W.2d 563, 571 (Tex.1981). That portion of the trial court's judgment that awards exemplary damages to the plaintiffs is, therefore, reversed.

### Actual Damages

■ The trial court's charge on actual damages instructed the jury that if it found that Rio Grande committed any of the wrongful acts, that the acts were intentional, and that the acts were the proximate cause of damages to the plaintiffs, they were to answer the questions on actual damages. The actual damages questions read:

> What sum of money, if any, if paid now in cash do you find from a preponderance of the evidence would fairly and reasonably compensate (each plaintiff) for his damages, if any, which you have found resulted from the actions of Rio Grande Land & Cattle Co., Inc.?

The jury found George E. Light III's actual damages to be $5,682, K.L. Cattle damages to be $150,743, and K.L. Bar's damages to be $33,798.

Dan Kinsel III testified as to the plaintiffs' actual damages.[5] His calculations, which were given to the jury, showed a difference of 27.7 ¢/lb between the cost of gain for the K.L. Bar cattle and 2,329 head of cattle owned by the individual defendants which were fed at Rio Grande. He then multiplied that amount by the average gain per head for the K.L. Bar cattle (244

---

5. He was a partner in the K.L. Bar Cattle Co.

lbs), and by the total number of K.L. Bar cattle kept at Rio Grande (500), to determine the total amount of K.L. Bar's actual damages. The sum he arrived at was $33,-798. The jury awarded him that sum. Kinsel made a multiplication error in his calculations. The sum he should have reached was $33,790. The trial court, therefore, is ordered to reform its judgment to reflect the proper amount.

Kinsel performed similar computations for the cattle owned by K.L. Cattle and by George E. Light III. His calculations showed that K.L. Cattle's total actual damages were $150,743.46. The jury found that amount, less $.46, to be K.L. Cattle's actual damages. Kinsel's calculations showed George E. Light III's total actual damages to be $5,682.42. The jury found that amount, less $.42, to be Lights' actual damages.

The defendants argue that the trial court erred in submitting the questions on actual damages because it is impossible to determine what the jury's damages awards were based on or if ten jurors agreed on the acts that caused the plaintiffs' damages. Their argument lacks merit. The clear language of the questions instructs the jurors to award damages that were the result of the wrongful acts that the jury found Rio Grande committed intentionally and were the proximate cause of the plaintiffs' damages. The jury could not have been confused by the instructions and issues nor led by them to make an improper damage award. In addition, whether Rio Grande committed more than one type of misconduct is of no consequence since it would not effect the amount of the plaintiffs' damages.

The cases cited by the defendants are not convincing. In *Parker v. Keyser*, 540 S.W. 2d 827 (Tex.Civ.App.—Corpus Christi 1976, no writ), a conversion case, the trial court awarded damages against Parker *and* Parsely on the basis of a jury finding that Parker *"and/or"* Parsely converted Keyser's property and that damages should be awarded against Parker *"and/or"* Parsely. *Id.* at 829. Because it could not determine if the jury found against both Parker

*and* Parsely on the liability and damages issues, the trial court erred in awarding judgment against both. *Id.* at 830–831.

In *Putter v. Anderson*, 601 S.W.2d 73 (Tex.Civ.App.—Dallas 1980, writ ref'd n.r. e.), the jury found, in a single issue, that Anderson had been libeled three times and awarded a single sum for damages. After the appellate court found two of the libels privileged as a matter of law, the entire cause was remanded because it could not be determined what portion of the jury's damages award was given to compensate the plaintiff for the third, unprivileged, libel. *Id.* at 77.

The defendants also argue that the actual damage questions were improper because the trial court failed to define the proper measure of damages and the questions left the jury free to speculate and consider other factors, citing *Planet Plows v. Evans*, 600 S.W.2d 874 (Tex.Civ.App.—Amarillo 1980, no writ) and *Stewart v. Moody*, 597 S.W.2d 556 (Tex.Civ.App.—Beaumont 1980, writ ref'd n.r.e.). The arguments lack merit and the cases they cite are inapplicable.

In *Planet Plows*, Evans presented evidence that Planet Plows material diverted the natural flow of surface water across his land. 600 S.W.2d at 875. Also introduced was evidence that surface water was also diverted across Evans land by structures on another, non-party, neighbor's land. *Id.* The trial court's damages instructions allowed the jury to make an award for all the damages caused by flowing surface water to Evans' property, not just those caused by Planet Plows. *Id.* at 876. The instruction was improper because it allowed the awarding of damages against Planet Plows for harm that Planet Plows did not cause. *Id.*

The jury in *Stewart v. Moody* was presented with allegations of several different measures of damages but given no instruction as to which one was proper. 597 S.W.2d at 558. Here, the jury was only presented with evidence of one measure of damages, a measure that was, as argued by the defendants, proper for a breach of contract action. *See Chrysler*

*Corp. v. McMorries*, 657 S.W.2d 858, 864–865 (Tex.App.—Amarillo 1983, no writ).

■ The defendants also attacked the jury's actual damages awards on no evidence and insufficient evidence grounds. They argue that while Dan Kinsel III was qualified to testify about the value of the K.L. Bar cattle, he was unqualified to testify about the cattle belonging to George E. Light III or to K.L. Cattle, citing *Tom Benson Chevrolet v. Alvarado*, 636 S.W.2d 815 (Tex.App.—San Antonio 1982, writ ref'd n.r.e.). We do not agree.

The evidence showed that Kinsel was as familiar with the cattle he personally owned as with the cattle owned by his family and the Light family.

Anyone who says that he is familiar with the value of a specific piece of property, particularly an owner of it, may testify as to its value. *Brown v. Brown*, 520 S.W.2d 571, 577 (Tex.Civ.App.—Houston [14th Dist.] 1975, writ dism'd). The strength or weakness of the qualifications of a witness testifying to value goes to the weight to be given to the testimony, not its admissibility. *Cortez v. Mascarro*, 412 S.W.2d 342, 343 (Tex.Civ.App.—San Antonio 1967, no writ). A trial court's admission of such testimony will not be disturbed unless it was clearly erroneous. *Webb v. Mitchell*, 371 S.W.2d 754, 760 (Tex.Civ.App.—Houston 1963, no writ). The trial court's admission of Kinsel's testimony was not erroneous. The evidence presented by Kinsel supports the jury's actual damages answer.[6]

### CORPORATE OFFICERS' LIABILITY FOR WRONGFUL ACTS

The individual defendants also complain of the jury's findings that they, with the design and for the purpose of injuring the plaintiffs, instructed the employees of Rio Grande to commit the wrongful acts it found Rio Grande committed against the plaintiffs. As a result of this finding, the trial court held all the defendants jointly and severally liable for the damages suffered by the plaintiffs. The defendants argue that: (1) there were no pleadings to support the issue's submission to the jury, (2) the issue was improper in that it did not apportion blame among them, (3) there was no evidence to support the issue's submission to the jury, and (4) there was insufficient evidence to support the jury's finding.

■ If a corporate officer commits wrongful acts while conducting the corporation's business, he will be held personally liable for the consequences of those acts. *See Medallion Homes v. Thermar Investments*, 698 S.W.2d 400, 403 (Tex.App.—Houston [14th Dist.] 1985, no writ); *Houston Chronicle v. Stewart*, 668 S.W.2d 727, 730 (Tex.App.—Houston [1st Dist.] 1983, writ dism'd); *Norton Refrigerated Express v. Ritter Brothers*, 552 S.W.2d 910, 913 (Tex.Civ.App.—Texarkana 1977, writ ref'd n.r.e.).

■ Pleadings should give fair and adequate notice of the facts upon which the pleader relies in order that the adverse party may properly prepare his defense. *Murray v. O & A Express, Inc.*, 630 S.W.2d 633, 636 (Tex.1982).

> When there are no special exceptions, a petition will be construed liberally in favor of the pleader. Also, "the court will look to the pleader's intendment and the pleading will be upheld even if some element of a cause of action has not been specifically alleged. Every factor will be supported that can reasonably be inferred from what is specifically stated."
> A petition is sufficient if it gives fair and adequate notice of the facts upon which the pleader bases his claim. The purpose of this rule is to give the opposing party information sufficient to enable him to prepare a defense. (citations omitted.)

*Roark v. Allen*, 633 S.W.2d 804, 809–810 (Tex.1982). Here, the defendants leveled no special exceptions to the plaintiffs' pleadings. The plaintiffs' pleadings, though generally pled, were adequate to inform the defendants that the plaintiffs sought to hold them personally responsible for the day-to-day control of the employees

---

**6.** Because we find that there was sufficient evidence to support the jury's actual damages awards, we overrule the defendants' no evidence points.

at Rio Grande and were responsible for their acts.

██ Kelly, the plaintiffs' primary witness, testified that he neither saw the individual defendants commit any fraudulent acts nor was told by them to commit any. Hayes was at Rio Grande on a day-to-day basis, and he managed Rio Grande's operations. The other individual defendants were at Rio Grande on a monthly basis and kept in touch on other occasions by telephone.

An outside accountant who led a team that audited Rio Grande testified that the accounting system used by Rio Grande followed accepted accounting standards. He also testified that his review of Rio Grande's books showed no indication that Rio Grande committed any of the wrongful acts alleged by the plaintiffs. But he also testified that he was not an expert in the detection of fraud. He further testified that if Kelly's allegations about his and Rodarte's activities were true, then Rodarte had to have had an accomplice at Rio Grande and that other people at Rio Grande had to have known what Rodarte was doing. He also testified that if there was wrongdoing going on on the scale alleged by Kelly, then everyone at Rio Grande would have known about it.

The accounting system at Rio Grande was set up by Agri–Beef, a corporation owned by Rebholtz and Hormaechea. Rio Grande's controller and computer operator, both of whom were involved in the recording of the amount of feed given to the animals at the feed lot and their weights, continued to work for Agri–Beef after the individual defendants disposed of their interests in Rio Grande. Rodarte worked for Hayes at other feed lots before he was hired by Rio Grande. Near the time the plaintiffs' suspicions about Rio Grande ripened, Rodarte was given a bonus equal to twice his normal monthly salary.

Board meeting minutes show that the individual defendants were aware that cattle belonging to their customers were becoming separated from their customer's other cattle. The policy devised by the

7. Bowen acquired his interest for $3,000.

individual defendants was to keep the lost cattle, feed them until they reached a salable weight, sell the animals, and keep the proceeds as a contingent liability for six months, at which time the proceeds were kept by Rio Grande. The plaintiffs argued that this procedure showed that the individual defendants were "stealing" their customers' cattle since they made no effort to determine who the cattle belonged to and made no attempt to give the proceeds of the lost cattle to their customers. The defendants argue that the procedure was an acceptable method of resolving what to do with the extra cattle.

The plaintiffs also argue that the proceeds realized from the sale of their interest in Rio Grande show that Rio Grande's accounting system was not designed to properly reflect its true financial status. The month when Rio Grande's financial statement showed that its profits from the year before were $10,000, Bowen sold his interest in Rio Grande for $250,000, a price some 55 times the amount of Rio Grande's earnings.[7] Hayes later sold his share, which was half the size of Bowen's, for $100,000. The purchasers of Bowen's and Hayes' shares were Rebholtz and Hormaechea. The plaintiffs argue that the amounts realized by Bowen and Hayes were completely out of line with the amounts they had invested in Rio Grande and the amount of Rio Grande's earnings. This indicated, plaintiffs argue, that Rio Grande's books did not reflect its true financial state, and were, therefore, an indication that Rio Grande's operations were based on fraud.

An appellate court will not disturb the finding of a jury on conflicting evidence where there is some evidence to support their verdict unless the verdict is so overwhelmingly against the evidence as to shock the conscience or to show clearly that the conclusion reached was wrong or was the result of passion, prejudice, or improper motive. *Swinney v. Winters*, 532 S.W.2d 396, 406 (Tex.Civ.App.—San Antonio 1975, writ ref'd n.r.e.). Since the jury

found that employees of Rio Grande intentionally charged for the feed given to the plaintiffs' animals and intentionally misweighed them, the jury apparently believed, as alleged by the plaintiffs, that the individual shareholders instructed their employees to commit the wrongful acts. We hold that there was sufficient circumstantial evidence that the individual defendants instructed Rio Grande's employees to commit wrongful acts.

## PRE–JUDGMENT INTEREST

 The plaintiffs complain of the amount the trial court awarded as prejudgment interest, six percent per annum. They argue that they should have been awarded ten percent, the amount permitted in tort cases. *See Cavnar v. Quality Control Parking*, 696 S.W.2d 549 (Tex.1985). The trial court relied on TEX.REV.CIV. STAT.ANN. art. 5069–1.03 (Vernon 1987), the statute that controls the amount awarded in contract cases where no amount was agreed to by the parties. *See Miner–Dederick Construction v. Mid–County Rental*, 603 S.W.2d 193, 200 (Tex.1980). Because we have held that the plaintiffs' cause of action sounded in contract and not in tort, and there was no agreement as to the amount of prejudgment interest, the trial court correctly awarded interest at the six percent rate. The plaintiffs' counterpoint is overruled.

That part of the trial court's judgment that awards actual damages and prejudgment interest to the plaintiffs is affirmed as modified. That part of the judgment that awarded exemplary damages is reversed and judgment is rendered that the plaintiffs take none.

CADENA, C.J., and CANTU, J., concur.