**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Appellant,**

**v.**

**Frank ZUBIATE and Sylvia Zubiate, Appellees.**

**No. 08–90–00035–CV.**

Court of Appeals of Texas, El Paso.

April 17, 1991.

Rehearing Overruled May 15, 1991.

Roger Townsend, Fulbright & Jaworski, Houston and H. Keith Myers, Grambling & Mounce, El Paso, for appellant.

J. Roberto Oaxaca and Susan Larsen, El Paso, for appellees.

Before OSBORN, C.J., and FULLER and WOODARD, JJ.

## OPINION

FULLER, Justice.

A jury awarded in excess of $15 million to the policyholders in a breach of duty of good faith and fair dealing suit against the insurance carrier, State Farm Mutual Automobile Insurance Company. The trial court entered judgment for the policyholders consistent with the jury findings. We affirm, subject to a remittitur.

Since we are ultimately going to have to address the complaint of the large award of punitive damages and the denial of any remittitur by the trial court, we must detail the evidence for analysis. *Rose v. Doctor Hospital*, 801 S.W.2d 841 (Tex.1990); *Pool v. Ford Motor Company*, 715 S.W.2d 629 (Tex.1986).

## FACTS

On December 6, 1986, Sylvia Zubiate, a Texas resident and a United States citizen, was involved in an automobile accident while driving her 1985 Mercury Cougar which was insured by the Appellant, State Farm Mutual Automobile Insurance Company (State Farm). Appellee, Sylvia Zubiate, was injured and required hospitalization. The facts as stated are not particularly unusual or frightening except that the accident occurred in Mexico. Our customary "taken for granted" constitutional rights and remedies have no application when United States' citizens enter into a foreign country.

Mrs. Zubiate reported the accident to her insurance carrier, State Farm. Mrs. Zubiate suffered a broken foot, broken hand, and had to have a finger reconstructed as a result of the accident. She was released

from the Juarez, Mexico hospital on December 24, 1986. The accident occurred at the 158 kilometer marker on the highway in the State of Chihuahua, Mexico, when a truck traveling at a high rate of speed with headlights on high beam struck Appellees' car. At approximately 1 a.m., her car that she was making monthly payments on, was totaled in the accident. Under Mexican law, an automobile collision can result in civil and/or criminal charges being filed against the driver. This happened to Mrs. Zubiate and resulted in her having to hire an attorney. "Presumption of innocence" has no application in Mexico. The Zubiates made claims to their own insurance carrier (State Farm) for collision, personal injury protection, liability defense and eventually, uninsured motorist coverage.

State Farm sent the Zubiates a "reservation of rights" letter dated January 2, 1987, that acknowledged her accident, stating that the police report placed the time of the accident at 4:30 p.m., and that the other auto involved in the accident was an unidentified diesel truck. The letter also stated:

There is a question under this policy with State Farm Mutual Automobile Insurance company [sic] ... as to whether or not this accident occurred 25 miles, or more, from the BOUNDARY of the United States of America. [Emphasis added].

This letter reminded the Zubiates that their insurance policy had a provision requiring their cooperation. The letter advised them that the insurance company was reserving all its policy defenses and retained the *right to file a declaratory judgment action.*

The Zubiates, who also had rental insurance coverage, were denied a rental car in December because of the "98 mile" argument.

State Farm's adjuster, Mr. Montes, telephoned Mrs. Zubiate on February 2, 1987, and took a recorded statement. Later, the State Farm adjuster concluded that the " '*Accident occurred 158 kilometers from the border which is approximately 98.7 miles. No coverage.*' " [Emphasis added]. State Farm then submitted its recommen-

dation to its regional office in Corpus Christi stating:

'The Mexican police report speaks for itself telling us that the accident occurred 98 miles south of El Paso, Texas and the Texas border. It is, therefore, recommended that we disclaim coverage to Mrs. Zubiate since the loss did not occur within the policy territory, or within twenty-five miles from the *boundary of the United States.*' [Emphasis added].

State Farm's Corpus Christi office followed the recommendation and concluded " 'No coverage as loss occurred over twenty-five miles south of U.S. *border* in Mexico.' " [Emphasis added].

On March 19, 1987, the Zubiates received another letter from State Farm stating:

*Our investigation* reveals that this accident occurred 158 kilometers or 98 miles south of Juarez, Chihuahua, Mexico and the Mexican/United States *boundary.* That is, the accident occurred more than 25 miles from the *boundary of the United States of America.* [Emphasis added].

The letter informs the Zubiates of "no coverage" under the policy. The Zubiates were again reminded that *the company reserved the right to file a declaratory judgment.* At that time, State Farm closed the file on the Zubiates' claim, never filing a declaratory judgment action.

It was admitted at trial that at the time of closing its file, no investigation had been personally attempted by State Farm in Mexico even though the means were readily available. State Farm decided that its policyholders' contentions were unworthy of further investigation.

On June 30, 1987, State Farm received a letter from Ray Pearson, an attorney, informing State Farm that it erred in determining that the accident occurred more than twenty-five miles from the United States/Mexico boundary. State Farm claims that they told Mr. Pearson to "give me some proof and we will certainly look into it," but that no information was forthcoming, so no further action was taken.

The Zubiates filed their lawsuit on August 26, 1987. State Farm then hired Danny Hurtado (an independent investigator) to further investigate the Zubiates' claim. Danny Hurtado was furnished State Farm's file which contained a "denial of coverage" recommendation by the local office of State Farm and an approval of "no coverage" by the Corpus Christi area office. Thereafter, a report submitted by Mr. Hurtado on September 16, 1987, revealed that Mr. Hurtado interviewed only the wrecker service company and an ambulance service in Juarez (which turned out to be the wrong ambulance company).

Danny Hurtado then looked at a wall map in the office of State Farm and, by using a ruler, concluded that the accident occurred " 'more than the twenty-five mile limit allowed by the Texas auto policy.' " *State Farm was still content not to investigate the accident scene.* It was not until around March 10, 1988, (fifteen months after the accident) that Danny Hurtado was told to physically go to the accident scene. This was approximately two days before Mr. Bitticks, State Farm's Resident Claims Superintendent, who was also the author of the rejection of coverage letters, was to be deposed in relation to this lawsuit.

After Mr. Hurtado went to the accident scene, he reported that the accident *did occur within twenty-five miles of the United States boundary, the Rio Grande River.* Thereafter, State Farm's representative, Gene Bitticks, while testifying on deposition, abandoned his "denial of coverage" based on the fact that the 158 kilometer marker placed the accident scene 98 miles in the interior to being 40 miles "outside of the Juarez/El Paso boarder." It was during this deposition that *"point of entry"* was first mentioned as the measuring determinative of the twenty-five mile coverage limit. On May 12, 1988, State Farm offered to defend Mrs. Zubiate in Mexico, contingent on dropping the uninsured motorist claim.

## SETTLEMENT OF BREACH OF CONTRACT COVERAGE ACTION

On approximately August 3, 1988, some twenty months after the accident, State Farm accepted coverage and agreed to pay the claims. Thereafter, on September 6, 1988, State Farm paid to the Zubiates on the insurance contract claim:

Automobile Collision Payment: $13,575.00—this figure includes the fair market value of the automobile, attorney's fees and interest (less $250.00 deductible).

Personal Injury Protection: $3,966.66—this figure includes medical bills, attorney's fees, penalty and interest.

Liability Claim: $1,357.50—this amount included attorney's fees, accident reconstruction expense and interest.

Later a settlement was made as to the uninsured motorist coverage:

Uninsured Motorist Coverage Payment: $50,000.00.

An agreed order of dismissal was then entered whereby the Appellees were left to proceed to litigate their "bad faith" cause of action against the Appellant.

## JURY VERDICT ON GOOD FAITH AND FAIR DEALING ACTION

After hearing evidence, the jury made findings favorable to the Zubiates by finding that:

(1) State Farm failed to deal fairly and failed to act in good faith in handling the Zubiates' claim;

(2) Such conduct by State Farm resulted in the suffering of mental anguish by the Zubiates;

(3) The Zubiates should be compensated $165,000.00 for the mental anguish they suffered in the past;

(4) The action of State Farm in not dealing fairly and in not acting in good faith in the payment of the Zubiates' claim which amounted to heedless and reckless disregard of the Zubiates' rights; and

(5) $15 million should be assessed against State Farm as exemplary damages.

Appellant filed a Motion to Disregard all the Jury Findings; a Motion for Judgment Non Obstante Verdicto; a Motion for Re-

mittitur; and, after judgment, a Motion for New Trial. All motions were overruled.

The trial court entered judgment on the jury verdict for the Zubiates: *$165,000.00 for actual damages; $15,000,000.00 for punitive damages and $26,987.66 prejudgment interest.*

## POINTS OF ERROR

In Points of Error Nos. One and Two, State Farm contends that there was no evidence or factually insufficient evidence to support the jury finding that it had breached its duty of good faith and fair dealing under the standard of heedless and reckless disregard of the Zubiates' rights. This Court must first determine if the "no evidence" point has merit before it may proceed. But, where the "no evidence" point fails, then the Court must review the evidence to determine if the evidence will support a jury verdict.

In deciding a "no evidence" challenge, the Court is to consider only that evidence and reasonable inferences therefrom which viewed in its most favorable light supports the jury finding, and the Court must reject all evidence or reasonable inferences to the contrary. *Stafford v. Stafford*, 726 S.W.2d 14, 16 (Tex.1987); *Glover v. Texas General Indemnity Company*, 619 S.W.2d 400, 401 (Tex.1981). The evidence revealed that:

(1) *State Farm* had for over fifteen months asserted that the accident was not within the mileage coverage under the insurance policy, in spite of its policyholders' contention. Yet, State Farm refused to check the accident until after it was sued.

(2) *State Farm's Resident Claims Superintendent* submitted a report to the regional office with a recommendation of *"no coverage."* Again this was done without an on site verification that the accident scene would have substantiated the Zubiates' claim that the accident was not "98 miles from the border."

(3) *State Farm* did not raise the issue of "port of entry" as the measurement for "boundary" as stated in the insurance contract until March 10, 1988. This was fifteen months after the accident.

(4) *State Farm* then fifteen months after the accident, offered to defend Mrs. Zubiate in her Mexico criminal lawsuit *BUT ONLY IF* she would drop the uninsured motorist claim. She refused.

(5) *State Farm,* on September 6, 1988, finally paid Mrs. Zubiate her collision claim, PIP, her medical claims' coverage and her attorney defense claim. This was some twenty months after the accident.

When viewed in the most favorable light, this is more than enough evidence to support the jury's finding of heedless and reckless disregard of the Zubiates' rights resulting in a breach of good faith and fair dealing on behalf of State Farm. The contention of no evidence fails because there is more than a scintilla of probative evidence supporting the finding. *Kindred v. Con/Chem., Inc.,* 650 S.W.2d 61, 63 (Tex. 1983).

The contention of insufficiency of the evidence is a question of fact. This Court, in reviewing the facts, is to consider all of the evidence in the record that is relevant to the fact being challenged. *Lofton v. Texas Brine Corporation,* 720 S.W.2d 804, 805 (Tex.1986); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660 (1951). Only after careful consideration and weighing of all the evidence, finding that it is so contrary to the overwhelming weight of the evidence that it is clearly wrong and unjust, may the Court set aside the finding. *Pope v. Moore,* 711 S.W.2d 622 (Tex.1986); *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *Croucher v. Croucher,* 660 S.W.2d 55 (Tex.1983). The Appellate Court is not a fact finder and therefore may not substitute its judgment for that of the jury, even if there is conflicting evidence upon which a different verdict could have been reached. *Texas Employers Insurance Association v. Alcantara,* 764 S.W.2d 865, 868 (Tex.App.—Texarkana 1989, no writ); *Rio Grande Land & Cattle Company v. Light,* 749 S.W.2d 206, 213 (Tex.App.—San Antonio, 1988), *rev'd on other grounds,* 758 S.W.2d 747 (Tex.1988);

Pool v. Ford Motor Company, 715 S.W.2d 629, 633–35 (Tex.1986).

The first fact being challenged is whether State Farm breached its duty of good faith and fair dealing. Texas recognizes a duty of good faith and fair dealing where a special relationship exists and is governed or created by a contract. *Manges v. Guerra*, 673 S.W.2d 180, 183 (Tex. 1984). Insurers owe a duty of good faith and fair dealing to their insureds. *Arnold v. National County Mutual Fire Insurance Company*, 725 S.W.2d 165, 167 (Tex. 1987). A cause of action for breach of duty of good faith and fair dealing will arise when there is no reasonable basis for denial of a claim or delay in payment or a failure on the part of the insurer to determine whether there is any reasonable basis for the denial or delay. *Aranda v. Insurance Co. of North America*, 748 S.W.2d 210, 213 (Tex.1988); *Arnold*, at 165. The first of these two elements requires an objective determination of whether a reasonable insurer under similar circumstances would have delayed or denied the claimant's benefits. The second element balances the right of an insurer to reject an invalid claim and the duty of the carrier to investigate and pay compensable claims. Under this test, carriers will maintain the right to deny invalid or questionable claims and will not be subject to liability for an erroneous denial of a claim. Carriers that breach the duty of good faith and fair dealing, however, will be subject to liability for their tortious conduct. *Aranda*, at 213. Ordinary tort damages, including exemplary damages, are recoverable for a breach of the duty of good faith and fair dealing upon a showing of the same elements that permit a recovery of those damages in other tort actions. *Arnold*, at 168.

The automobile policy held by the Zubiates explicitly limited coverage of accidents occurring within Mexico, stating:

This provision does not apply to trips into Mexico that exceed 25 miles from *the boundary* of the United States of America. [Emphasis added].

The policy continues on to state:

The coverages for your covered auto provided by this policy are extended to accidents occurring in Mexico within *25 miles of the United States BORDER*. [Emphasis added].

State Farm contends that the interpretation of the meaning of *"boundary"* as meaning *"point of entry"* was reasonable, and that their denial of the claim for over fifteen months on this basis was also reasonable. State Farm alleges that because they did not "personally" investigate the site of the accident, but rather relied on the police report, area map and an investigator's report, that they acted *reasonably* under the facts and circumstances of this case. Evidence was before the jury that the terms *"boundary"* and *"border"* had been in the insurance policy at least THIRTY YEARS.

State Farm, on oral argument, contended the terms *"boundary"* and *"border"* were ambiguous but never exercised its right to declaratory judgment after having twice informed Appellees that it was reserving that right.

For over fifteen months, State Farm relied solely on the Mexico police report and an investigator's discussion with the wrecker company and ambulance service as the basis to deny the Zubiates' claim. No State Farm adjuster or an investigator went to Juarez to personally investigate the accident site. Instead, State Farm clung to the interpretation that the accident occurred ninety-eight miles from Juarez in spite of such denial by the Zubiates, its long time customers/policyholders. Not until after the suit was filed and depositions were set of its Resident Claims Superintendent did State Farm decide to "get with it" and proceed with an "on site" investigation. This resulted in a determination that the accident occurred within twenty-five miles of the U.S./Mexico border and less than forty miles from where Mrs. Zubiate crossed the bridge into Mexico.

The contention that *"boundary"* and *"border"* meant *"port of entry"* was not raised by State Farm until fifteen months after the accident occurred when the mileage was corrected from ninety-eight miles

to forty miles. During all this time, the Zubiates contested State Farm's denial of their claim. State Farm states in its brief that "[t]he police report, a map of the area, and Mrs. Zubiate's statement [of where the accident occurred out by the Juarez airport] all indicated that Mrs. Zubiate had traveled more than 25 miles from her point of entry...." The key word in this statement is "indicated." State Farm would have this Court interpret "indicated" as an actual good faith effort to investigate and settle the Zubiates' claim. This same contention was before the jury which did not accept this argument and we see no reason for this Court to disregard the jury determination of whether State Farm acted in good faith. After all, credibility of the witnesses was for the jury's determination and not for this Court to determine. The jury was entitled to believe, under the evidence in this case, that State Farm's action was a willful and deliberate attempt to avoid coverage.

Reasonableness is the standard. Was it reasonable for State Farm to interpret the contract language to mean "point of entry?" The problem with this question is that it was asked too late in the "game" to have much effect. State Farm cites *National Union Fire Insurance Company of Pittsburgh Pennsylvania v. Hudson Energy Company, Inc.*, 780 S.W.2d 417, 427 (Tex.App.—Texarkana 1989, writ granted) for the proposition that "delays or refusal to pay are not unreasonable where there is a legitimate question of policy construction." The "interpretation of the contract" took place *after fifteen months of claim denial on the basis of "98 miles from Juarez."* Once the interpretation of the contract became a valid issue that the accident occurred forty miles from where Mrs. Zubiate entered Mexico, it took the company *two months* for State Farm to decide to "defend the claim in Mexico," and *three more months* to accept coverage and decide to pay the claim.

The reasonableness of State Farm's actions prior to the taking of the depositions and the "contract interpretation" carries the most weight. Was it reasonable for State Farm to purport to investigate the accident and then turn around and deny the Zubiates' claim on the basis of a report that did not include an investigation of the accident scene? A glance at the signatures on the jury verdict readily indicates that the jury that made the award was composed of both Anglos and Hispanics. Residing along the border creates some familiarity and often some justifiable concern with the pleasures and problems of travel in Mexico. Insurance coverage is important and recommended for people traveling in Mexico. Differences in law enforcement methods in the United States and in Mexico appear almost weekly in local papers.

The jury could justifiably believe that State Farm was unreasonable in relying on Mexican police reports alone without an on-site investigation. This is especially true when a United States citizen becomes involved in an accident with a Mexican citizen in Mexico. The jury was also entitled to consider that Gene Bitticks, the Resident Claims Superintendent, was an extremely knowledgeable managerial employee, having been an adjuster for twenty-six years and a supervisor for five years in the El Paso area. He testified that there were 40 to 50 thousand State Farm policyholders in the El Paso area. He stated that in accident investigations, it was common to locate accident scenes on highways by referring to law enforcement reports for a "mile marker or milepost" number. *Was it reasonable for State Farm to neglect to fully investigate the claim for fifteen months when its denial of the claim was contested from the outset?*

These are the issues and evidence that were presented to the jury to determine the *reasonableness* of State Farm's actions in denying the Zubiates' claim. The Zubiates pleaded and produced sufficient evidence to raise a genuine issue of material fact as to whether State Farm had a reasonable basis for refusing to pay them under the terms of the contract concerning coverage in Mexico.

■　 State Farm next contends that the "heedless and reckless disregard" standard applied to the jury determination and was

not sufficiently met by the Zubiates. The jury was instructed that:

"Heedless" and "Reckless Disregard" means more than momentary thoughtlessness, inadvertence or error of judgment. It means such an entire want of care as to indicate that the act or omission in question was the result of conscious indifference to the rights, welfare, or safety of the person affected by it.

This instruction tracks the language contained in the Texas Pattern Jury Charges § 3.11 as promulgated by the State Bar of Texas. This definition is synonymous to "gross negligence." *Burk Royalty Company v. Walls*, 616 S.W.2d 911, 920 (Tex. 1981). Thus, the standard of review is the same as in any other fact issue. In determining whether there was insufficient evidence, the Court is to consider all of the evidence in the record that is relevant to the fact being challenged. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951).

The facts "speak for themselves" in that there was ample evidence for the jury to make a careful, deliberate determination as to the issue of "heedless and reckless disregard."

Points of Error Nos. One and Two are overruled.

Point of Error No. Ten asserts that the common law duty of good faith and fair dealing should not apply because the Zubiates have a remedy under the Texas Insurance Code.

■ Insurers owe a duty of good faith and fair dealing to their insureds. *Arnold v. National County Mutual Fire Insurance Company*, 725 S.W.2d 165, 167 (Tex. 1987). The Insurance Code does not provide the exclusive remedy for this cause of action. The Code was not intended to shield carriers from the entire field of tort law. *Reed Tool Company v. Copelin*, 610 S.W.2d 736, 739 (Tex.1980). The exclusivity provision in the Insurance Code cannot be read as a bar to a claim that is not based on the insurance contract to pay, but rather on the duty to deal fairly and in good faith in the processing of a claim. *Aranda v. Insurance Co. of North America*, 748

S.W.2d, at 214. It is only one method of recovery.

■ It is the prerogative of the plaintiff to select on which cause of action to file suit. It is also the risk that a plaintiff takes in choosing that he may choose the cause of action that may fail. But, it is the plaintiff, not the defendant, that elects which cause of action to pursue. The Zubiates made the election to seek recovery under the common law tort rather than under the Insurance Code and cannot be forced to choose one remedy over the other.

Point of Error No. Ten is overruled.

### MENTAL ANGUISH

■ Points of Error Nos. Eight and Nine assert that the actual damage award of $165,000.00 for mental anguish with no physical manifestation was not supported by the evidence and thus was excessive. Recovery for mental anguish without proof of physical injury was established in *Sanchez v. Schindler*, 651 S.W.2d 249 (Tex. 1983). But, it was not until 1987, that the Supreme Court fully recognized that proof of physical injury resulting from mental anguish is no longer an element of the common law action for negligent infliction of mental anguish. *St. Elizabeth Hospital v. Gerrard*, 730 S.W.2d 649, 654 (Tex.1987).

■ This leads to State Farm's assertion that without physical manifestation of mental anguish, the award was excessive. State Farm contends that the Zubiates, at most, experienced anger, worry, embarrassment, inconvenience and 'hurt' feelings—none of which rise to the level of mental anguish under Texas law. What State Farm is referring to is the accepted standard that in order to recover damages for mental anguish, the plaintiff must demonstrate more than mere worry, anxiety, vexation, embarrassment or anger. *Town East Ford Sales, Inc. v. Gray*, 730 S.W.2d 796, 803–804 (Tex.App.—Dallas 1987, no writ); *Ryder Truck Rentals v. Latham*, 593 S.W.2d 334 (Tex.Civ.App.—El Paso 1979, writ ref'd n.r.e.). "Part of the proof in a case includes the witnesses them-

selves, their demeanor, their voice modulation, and the gut feeling they project to the jurors." *Herbert v. Herbert,* 754 S.W.2d 141, 147 (Tex.1988). But, it is not necessarily how much a plaintiff emotes in the jury's presence that counts. It is the evidence of what has taken place in a plaintiff's life as a result of a defendant's actions, to which the jury can relate, that is just as important. *See City of Ingleside v. Kneuper,* 768 S.W.2d 451, 460 (Tex.App.— Austin 1989, writ denied).

The facts presented at trial include the understanding that the Zubiates were making a claim for mental anguish arising from the denial of their claim not the actual damages themselves. Mrs. Zubiate stated that when she received the first letter from State Farm, dated January 2, 1987, she felt *"intimidated"* and *"confused"* because of the discrepancies in the time of the accident, and that the accident was with an "unidentified diesel truck," even though charges had been preferred against her by the driver of the truck by the time she received the letter. Mrs. Zubiate also stated that the letter *"frightened"* her because the letter stated that State Farm was retaining the right to file a declaratory judgment. That meant they might sue her, as she understood it. She was also *"frightened"* by receiving the letter through certified mail, this was not usual for her. When Mrs. Zubiate received the second letter, dated March 19, 1987, she stated that she felt *"angry," "scared"* and *"devastated."* She related the effect that the denial of the claim had on her husband, Frank, "he was kind of depressed ... everything was just caving in ... he didn't know what he was going to do." Medical bills from the accident accumulated. The automobile, which was totaled in the accident, was financed and the Zubiates continued to make payments until finally they could not make the payments anymore which the Zubiates realized hurt their credit rating. Because of the accident, Mrs. Zubiate was charged with criminal charges in Mexico. She had to borrow the bond money from her father and report to the court in Juarez, Mexico once a week at an appointed time. Although it is Mexican law that requires weekly reporting, the reason for the reporting was to maintain a plea of innocence so that civil damages could be sought and recovered simultaneously with a finding of innocence on the criminal charges. In Mexico, in a situation such as this, the civil suit is dependent on the finding in the criminal suit, and a civil suit is generally simultaneous to the criminal suit, as explained by Mr. Ochoa, a Juarez attorney. Mrs. Zubiate stated that the reason she continued to report every week was to help her husband with finances, that by keeping the claim alive in Mexico, knowing she was innocent, she would be able to collect for damages and medical expenses against the truck driver, because State Farm had denied payment for these expenses. She stated she was *embarrassed* by having to report weekly to the Juarez court. She also encountered much physical and emotional pain in having to drive or ride over to Juarez every week, climb the stairs on crutches and being frightened by having to get back down the stairs because they were so steep. Mrs. Zubiate *"felt angry"* toward State Farm, *that they had betrayed her "100%."* After the Zubiates finally received payment on the accident, some twenty months later, Mrs. Zubiate stated she still felt *"hurt"* because they had to go "through a lot of problems and it was unnecessary."

Frank Zubiate also testified at trial as to the mental anguish suffered by the Zubiates. Mr. Zubiate stated that he telephoned his State Farm agent on the Monday following the accident, Saturday of December 6, 1986. He was told by the agent's office that he needed to get a police report which, after many attempts, he was unable to get it. On December 24, 1986, Mr. Zubiate called Julio Montes, with State Farm, to see about getting a rental car since the clutch had just gone out on his car, his wife's car had been totaled in the accident and because he knew that he carried rental car insurance. Mr. Zubiate stated that Mr. Montes told him "do you know that you are not covered ... [because the accident] was 98 miles into the interior." This was the first time Mr. Zubiate was

made aware of State Farm's intention not to cover the claim. It was during that same conversation that Mr. Zubiate found out that Mr. Montes had the police report, and was also told he could not have a copy because it was company property. After receipt of the first letter, Mr. Zubiate was concerned so he called Mr. Montes again. Mr. Montes told him that the accident was under investigation and could not tell him anything beyond that. When the Zubiates received the second letter, Mr. Zubiate called Mr. Montes to tell him they were mistaken, that the accident could not have occurred ninety-eight miles from the border. Mr. Montes responded that that was what their investigation revealed.

Mr. Zubiate also testified about attempting to continue to make the car payments on the 1985 Cougar even though it had been totaled in the accident. There were some months that the house payment would not get made because of car payments. Mr. Zubiate, afraid of losing the house and ruining his credit, quit paying on the car. Mr. Zubiate explained that after the accident, his credit rating dropped. He stated that the creditors would "call me at work" and that "everything fell on top of me." Mr. Zubiate told of how his twenty year marriage suffered. He further stated that after the accident and denial of the claim, he and his wife "started having arguments. On February of 1987, I believe I had to put her back in the hospital here in El Paso." That is when he brought her home from the hospital "she couldn't get up from bed. I had to go to work. I fixed everything for her in the morning. When I would get home, she was just waiting for me to help her ...." Mr. Zubiate said he felt *"very hurt"* because of her condition. He stated he had *mental pain, anguish, nervousness and did not know what to do with his bills.* Mr. Zubiate stated that he *had to watch her suffer.* That *"she felt humiliated. She was frightened. Nervous. She couldn't sleep.... Depression would get in her. ... everything was just caving in on her as well as me."* He continued on to state that he *"felt very frustrated, very nervous ... there were times I couldn't sleep thinking of her*

*going through all of this.... Anguish."* [Emphasis added].

Mr. Zubiate stated that he had to rely on State Farm's representation to him concerning the accident because he was unable to get a police report until late March when he finally secured a report from the Juarez officials but not from State Farm. Mr. Zubiate also testified about the bond they had to put up, the weekly reporting and reasons for keeping the suit alive. Mr. Zubiate testified about the conditional offer by State Farm to: (1) defend in Mexico if the Zubiates would drop their uninsured motorist claim and (2) settle if the Zubiates would "drop this case."

■ In light of the facts and circumstances that were related to the jury during the trial by the Zubiates, it is apparent that the Zubiates satisfied the requirement that they must demonstrate more than mere worry, anxiety, vexation, embarrassment or anger. *Town East Ford Sales, Inc.,* at 803–804. The jury did not have to base its decision solely on the witnesses' testimony and demeanor. The jury could also consider all the evidence as to what had taken place in the Zubiates' life as a result of the claim denial. *City of Ingleside,* at 460.

■ Once the existence of some amount of mental anguish has been established, the incalculable quantity cannot logically be refuted or shown to be factually insufficient because there are no objective facts to calibrate measurement. Translating mental anguish into dollars is necessarily an arbitrary process. The jury is given no guidelines, for there are no objective standards of measurement. Intrinsic values cannot be extrinsically quantified except by arbitrary means. *Brown v. Robinson,* 747 S.W.2d 24 (Tex.App.—El Paso 1988, no writ). Much discretion must be given to the jury in setting the amount. *Tidelands Automobile Club v. Walters,* 699 S.W.2d 939, 945 (Tex.App.—Beaumont 1985, writ ref'd n.r.e.). No court is free to substitute its judgment for that of a jury. *Larson v. Cactus Utility Company,* 730 S.W.2d 640 (Tex.1987).

Points of Error Nos. Eight and Nine are overruled.

## NET WORTH AND PUNITIVE DAMAGES

In Points of Error Nos. Four and Five, State Farm contends that the evidence concerning State Farm's total assets and net worth should not have been admitted into evidence and that by doing so, it denied them a fair trial and violated their rights to due process and equal protection under Tex. Const. art. I, § 19 and United States Constitution amend. XIV.

Initially, State Farm asserts that *Lunsford v. Morris*, 746 S.W.2d 471 (Tex.1988) is inapplicable to the instant case because it deals with the discoverability of net worth. But, *Lunsford* explicitly stated:

> *We hold that in cases in which punitive or exemplary damages may be awarded, parties may discover and offer evidence of a defendant's net worth.* [Emphasis added].

*Id.*, at 473. In *Farah Manufacturing Company, Inc. v. Alvarado*, 763 S.W.2d 529, 534 (Tex.Civ.App.—El Paso 1988, affirmed), this Court reiterated *Lunsford* in stating:

> The Texas Supreme Court recently held that a civil defendant's net worth was discoverable and admissible in evidence when punitive or exemplary damages are properly in issue. [Cite omitted]. The reason for permitting evidence of a defendant's net worth is to provide the jury with a rational guide for determining the amount of punitive damages necessary to deter similar wrongful conduct in the future.

State Farm contends that if net worth is to be permitted to be put into evidence, then this evidence should not be allowed to be introduced until the end of the trial when the issue of punitive damages is clear and is the only issue remaining. *State Farm did not move for a bifurcated trial as to net worth and punitive damages.*

State Farm has two complaints on the introduction of its net worth. First, that total assets were improperly introduced as an element of net worth. But, as the Zubiates' counsel points out, he was not going to introduce the exhibit, but rather the admission that states only net worth. *It was State Farm's own objection of lack of definitions that prompted the introduction of "assets, liabilities and net worth" as being included.* In formulating net worth, total assets less liabilities were introduced to calculate the remaining figure of net worth as was required and requested as a definition by, initially, State Farm, and then the Zubiates. Second, that net worth was never at issue. As stated above, there was sufficient evidence produced at trial to raise a genuine issue of fact of whether State Farm had acted in bad faith. This was the threshold necessary for the introduction of net worth.

The record reflects that the admissions containing State Farm's "financial statement showing assets, liabilities and net income" were introduced at trial on a second offer after the court determined that sufficient evidence had been produced at trial to warrant the submission of net worth for the purpose of exemplary damages. Then, at the request and submission of State Farm, limiting instructions were drafted and submitted to the court. After the introduction of the admissions and limiting instructions, State Farm once again objected to the admission of the evidence for any purpose and then moved for a mistrial which was denied by the court.

Finally, State Farm asserts that the introduction of its net worth was prejudicial and outweighed whatever probative value it had under Tex.R.Civ.Evid. 403. State Farm bases this argument on what was expounded on in closing arguments, which is not the true basis of the court permitting the evidence to be introduced during the trial. The purpose of exemplary damages is to deter the wrongdoer and prevent future harms of the same nature. To do so, the punishment should fit the crime. What is punishment for one may be a slap on the hand for another. So that exemplary damages will fulfill their purpose, it is necessary to discover and provide

the trier of fact with evidence of the net worth of the wrongdoer in order to make the punishment have an impact so as to deter future wrongs by the same wrongdoer or those similarly situated.

■ This leads to the issue of whether State Farm was deprived of a fair trial and denied its rights to due process and equal protection. The Tex.Const. art. I, § 19, states:

No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except the due course of the law of the land.

This is a due process of law provision. This includes both procedural protections and substantive protection. Both liberty and property are subject to the state's legitimate exercise of police powers in weighing the gain to the public welfare against the severity of its effect on personal and property rights. Due process, in the context of the instant case, begins with the fact that State Farm was afforded a trial by its peers. State Farm had the same opportunity to disprove the allegation of breach of duty of good faith and fair dealing. But, because State Farm failed to convince the jury that it had acted "reasonably," State Farm now complains that the jury should not have been permitted to see what the company had in assets in order to determine an appropriate punishment. The United States Supreme Court has found that net worth is a proper evidentiary factor in determining punitive damages. *Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 270, 101 S.Ct. 2748, 2761, 69 L.Ed.2d 616, 634 (1981). This is the same standard as applied in *Lunsford* for determining an appropriate deterrent against the wrongdoer. *Lunsford,* at 472. There is no due process violation by admitting evidence of a wrongdoer's net worth for the purpose of determining a proper punishment.

■ The denial of equal protection claim by State Farm is vague. In an attempt to address the equal protection claim, the only identifiable classification would be that of a corporation versus an individual. The only possible argument under this claim is that an individual's wealth generally will not be near as enormous as that of a corporation. And because of the wide discrepancy, and the fact that a corporation, rather than an individual, is the defendant, juries will be inflamed and prejudiced by the introduction of net worth. But, the basic premise for exemplary damages remains the same, no matter the classification of the defendant, that being, to deter future wrongdoing by the wrongdoer.

The question of equal protection in light of disproportionate punishment, without a rational basis, is also another viable angle, but was not discussed by State Farm. Under this argument, Texas has established what is considered to be a "blending of the interests of society with those of the aggrieved individual" in justifying punitive damages to punish the offender, not just to recompense the sufferer. *Lunsford* at 471, *citing Graham v. Roder,* 5 Tex. 141, 149 (1849).

The United States Supreme Court has recently held that the punitive damages assessed by the jury were not violative of the due process clause of the Fourteenth Amendment. *Pacific Mutual Life Insurance Company v. Cleopatra Haslip,* — U.S. ——, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). As in the *Haslip* case, the jury in the instant case was not left to wander recklessly nor aimlessly. The trial judge, in the instant case, instructed on the intent and purpose of punitive damages as well as giving the jury factors they could consider in determining the amount of exemplary damages. The trial court also conducted a post-verdict hearing wherein he had the power to grant a new trial or order a remittitur.

In support of a finding that there was no denial of both due process and equal protection, the Court's attention is directed to the requisite five factors that are to be considered in determining whether an award of exemplary damages is reasonable. These five factors include:

(1) The nature of the wrong;

(2) The character of the conduct involved;

(3) The degree of culpability of the wrongdoer;

(4) The situation and sensibilities of the party concerned; and

(5) The extent to which such conduct offends a public sense of justice and propriety.

*Alamo National Bank v. Kraus,* 616 S.W.2d 908, 910 (Tex.1981). And, in the instant case, two additional factors were added to provide State Farm with additional safeguards in the determination of exemplary damages: (1) The frequency of the wrongs committed; and (2) the size of an award needed to deter similar wrongs in the future. The jury's guidance in determining the necessary amount to deter future wrongs was not "unfettered," but, rather well guided by the court and the purposes of exemplary damages. The fact that the net worth of State Farm was a large number, in comparison to an individual, is insufficient to find a violation of equal protection.

Points of Error Nos. Four and Five are overruled.

■ In Point of Error No. Six, State Farm contends that the jury award of $15 million in exemplary damages violated its rights to due process and equal protection under the Tex.Const. art. I, § 19 and the U.S. Const. amend. XIV. Again, State Farm raises the issue that the jury was "unfettered" in being allowed to make a wide open determination and assess such an enormous award.

The trial court instructed the jury with seven factors to consider in assessing exemplary damages. The court instructed:

"Exemplary damages" means an amount that you may in your discretion award as punishment of the wrongdoer and as a warning and example to prevent the wrongdoer and others situated like it from committing like offenses and wrongs in the future.

In determining the amount, you may consider:

(1) The nature of the wrong;

(2) The frequency of the wrongs committed;

(3) The character of the conduct involved;

(4) The degree of culpability of the wrongdoer;

(5) The situation and sensibilities of the parties concerned;

(6) The extent to which such conduct offends a public sense of justice and propriety; and

(7) The size of an award needed to deter similar wrongs in the future.

As demonstrated by previous case law establishing the requisite five factors, and by the record in this case expanding the factors to seven, the jury was not left to make an erroneous, baseless award of exemplary damages. State Farm's right to due process has been well protected in the instant case through the application of the seven factors, as well as State Farm's ability to protect its interest and introduce evidence to rebut any, or all, of the determining factors. It is also clear that the award was not a violation of State Farm's rights to equal protection, for the reasons that corporations, like individuals, are afforded the seven factors list as safeguards of those rights, and those factors serve the purpose of permitting the imposition of punitive damages. *Lunsford* at 471.

Point of Error No. Six is overruled.

Point of Error No. Seven claims that the award of $15 million is unconstitutionally excessive and is a violation of the prohibition of excessive fines under the Tex.Const. art. I, § 13, which states:

Excessive bail shall not be required, nor excessive fines imposed, nor cruel or unusual punishment inflicted. All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law.

Federal law interprets the Eighth Amendment to the United States Constitution, the federal counterpart to the Texas law concerning excessive fines, as being inapplicable to punitive-damages awards between private parties. *Browning–Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc.,* 492 U.S. 257, 109 S.Ct. 2909,

106 L.Ed.2d 219 (1989). Yet, in Tex.Const. art. I, § 13, it has been interpreted to include civil penalties. *Pennington v. Singleton,* 606 S.W.2d 682, 690 (Tex.1980).

■ A primary consideration in determining whether a fine is excessive is whether it is fixed with reference to the object it is to accomplish. *Id.,* at 690. In the instant case, the object to be accomplished is to deter State Farm and others similarly situated from the same kind of conduct that is the basis of this suit, a breach of the duty of good faith and fair dealing when investigating and making a determination of whether the claim is valid or not.

■ The Supreme Court of the United States has held that fixing the amount of fines is a matter falling within the purview of the police power of the states. However, a fine could be in violation of the Fourteenth Amendment of the United States Constitution if it were so grossly excessive as to amount to a deprivation of property without due process of law. *Waters–Pierce Oil Co. v. State of Texas,* 212 U.S. 86, 29 S.Ct. 220, 53 L.Ed. 417 (1908). As determined previously, there has not been a violation of State Farm's due process rights and the fine imposed has been determined to bear a direct relationship to the purposes of the imposition of the fine.

Point of Error No. Seven is overruled.

## IS THE EVIDENCE FACTUALLY INSUFFICIENT TO SUPPORT THE AMOUNT OF THE PUNITIVE DAMAGE AWARD?

■ Point of Error No. Three relates to the excessiveness of the exemplary damages and the trial court's failure to grant remittitur. A remittitur is only proper when the evidence is factually insufficient to support the verdict. *Pope v. Moore,* 711 S.W.2d 622 (Tex.1986); *Larson v. Cactus Utility Company,* 730 S.W.2d 640 (Tex.1987); *Brown v. Robinson,* 747 S.W.2d 24 (Tex.App.—El Paso 1988, no writ); *National Union Fire Insurance Company v. Dominguez,* 793 S.W.2d 66 (Tex.App.—El Paso 1990, writ denied, mtn.

for reh'g pending). A factually insufficient matter is one in which the jury's finding is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Croucher v. Croucher,* 660 S.W.2d 55 (Tex.1983).

■ State Farm would have this Court apply a reasonable proportion rule at this stage of the proceedings. The Courts today are faced with a real dilemma: Is the evidence factually sufficient to support the trial court's judgment upholding the jury award of $15 million in punitive damages against Appellant? Our answer is no, but why? *Because it just is.* With 40,000 to 50,000 policyholders in this border town, State Farm can expect those policyholders to venture into Mexico. Coverage is vital, and the jury was entitled to consider the treatment by State Farm of Mrs. Zubiate who had been its policyholder for over sixteen years. The jury was justified in finding a deliberate and unjustified mishandling of this claim resulting in its policyholder having to hire an attorney to enforce her rights. The conduct of the Appellant in this case warranted the finding of punitive damages, and State Farm should rightly be punished for the treatment of its policyholder.

In spite of what has been stated, we find that there is factually insufficient evidence to warrant the punitive damages award of $15 million. What is the practical remedy?

No doubt bifurcated trials will solve some of the problems as to punitive damages. Requiring a burden of proof by a "clear and convincing doubt" or even "beyond a reasonable doubt" evidentiary standard may help.

We often permit jurors to assess a dollar amount to subjective matters such as: (1) pain and suffering, past and future; (2) mental anguish, past and future; (3) future earning capacity; and (4) extent of disability. We also instruct jurors to decide issues on the basis of what a "reasonable prudent person under the same or similar circumstances" would do. These discretionary decisions have served this State and Country since the enactment of our Constitution and Bill of Rights.

Excessive awards are and should always be reviewable on the basis of "no evidence" and/or "insufficient evidence."

It would not accomplish anything to send the case back for retrial if a remittitur could be accomplished. Would another verdict where punitive damages might be set at $10 million, or $6 million or $3 million be factually sufficient?

Our legislature has begun to place limitations on awards as evidence by caps on exemplary damages as found in the Medical Liability and Insurance Improvement Act, Tex.Rev.Civ.Stat.Ann. art. 4590i (Vernon Supp.1986); the Texas Tort Claims Act and as provided by Tex.Civ.Prac. & Rem. Code Ann. § 41.007 (Vernon Supp.1991).

The conduct of the Appellant fully justified the jury in finding that Appellant set out on a deliberate course to dodge coverage to its own policyholder. But Mrs. Zubiate's injuries were not life threatening and the evidence is simply factually insufficient to support such a large award.

Point of Error No. Three is sustained.

We therefore find that the award of $660,000.00 as punitive damages under the evidence of this case would be fair, proper and reasonable yet consistent with the intent of purposes of allowing recovery of such damages. This would suggest a remittitur in the amount of $14,340,000.00 as a alternative to remand.

## CONCLUSION

We reverse the judgment of the trial court on the basis that the evidence is factually insufficient to support an award of $15 million as punitive damages. However, as an alternative to remanding the case for a new trial, pursuant to Rule 85(c) of the Texas Rules of Appellate Procedure, if a remittitur of $14,340.000.00 is filed by Appellees within thirty days from the date of this opinion, the case will be affirmed.

OSBORN, Chief Justice, concurring.

I concur in Justice Fuller's opinion for the Court. I write only to discuss the issues which both trial and appellate courts have concerning an award of damages on issues which have no exact standard for review. This Court noted the problem in the opinion by Justice Woodard in *Brown v. Robinson*, 747 S.W.2d 24 (Tex.App.—El Paso 1988, no writ) which noted that with regard to an award for mental anguish "there are no objective standards of measurement." The Court said "[o]nce the existence of some amount of mental anguish has been established, the incalculable quantity cannot logically be refuted or shown to be factually insufficient because there are no objective facts to calibrate measurement." We have continued to recognize that without objective standards, the jury's determination must necessarily be an arbitrary process, not subject to objective analysis on appeal. *Daylin, Inc. v. Juarez*, 766 S.W.2d 347 (Tex.App.—El Paso 1989, writ denied) and *Paragon Hotel Corporation v. Ramirez*, 783 S.W.2d 654 (Tex.App.—El Paso 1990, writ denied); *National Union Fire Insurance Company of Pittsburgh Pennsylvania v. Dominguez*, 793 S.W.2d 66 (Tex.App.—El Paso 1990, writ denied).

Likewise, in awarding exemplary damages, the jury's determination is an arbitrary process without any objective standards. Perhaps the most cited case on this issue is *Alamo National Bank v. Kraus*, 616 S.W.2d 908 (Tex.1981). First, that opinion tells us that "[e]xemplary damages must be reasonably proportioned to actual damages." If that is the overriding test, the case now before us is easy because there is no reasonable proportionment. But, in *Kraus*, the Court went further and set forth five factors to consider in determining whether an award of exemplary damages is reasonable. As noted by Justice Fuller, the trial court in this case added two additional factors. Perhaps each of those seven factors are relevant with regard to what evidence is admissible on the issue of exemplary damages. But, do they give either the jury or the appellate court any standards by which to make a proper determination of the issue? I submit that the answer is no. If the jury finds evidence to support two factors, are the exemplary damages two times "something"? Or if they find all seven factors are the

exemplary damages seven times "something"? No, and even if the answer is yes, the question remains seven times "what"? If the jury is to follow the direction from the *Kraus* opinion, the single most important instruction would very simply be "[i]n answer to the question as to exemplary damages, you are instructed that your answer must be reasonably proportioned to your answer to question no. _____", which number would be the issue inquiring as to actual damages.

Until we are able to devise an objective standard by which the jury is to award exemplary damages, we must recognize that the jury's answer will always be arbitrary. If the original award is arbitrary, is it really bad to have an arbitrary review? In *Dallas Ry. & Terminal Co. v. Farnsworth*, 148 Tex. 584, 227 S.W.2d 1017 (1950), the Court, in an opinion by Justice Smedley, recognized that an intermediate appellate court could find a verdict excessive and subject to a remittitur when, after consideration of the amount of the verdict and the evidence bearing upon the amount, it finds that the verdict is excessive and that the cause should be reversed for that reason only. The Court concluded that there need not be extraneous proof of passion or prejudice on the part of the jury. Did not the Court conclude that the intermediate appellate judges probably had some good sense and reasonable judgment and that they ought to apply both in a proper case?

This Court has tried to be guided by those principles. In *Halliburton Company v. Olivas*, 517 S.W.2d 349, 353 (Tex.Civ. App.—El Paso 1974, no writ), Justice Ward wrote:

> The test repeatedly made it that "All the Court of Civil Appeals can do, and all that is required of it to do, ..., is to exercise its sound discretion in the ascertainment of what amount would be reasonable compensation for the injury sustained, and treat the balance as excess." *Wilson v. Freeman*, 108 Tex. 121, 185 S.W. 993 (1916); *Flanigan v. Carswell*, 159 Tex. 598, 324 S.W.2d 835 (1959).

As noted in *Flanigan v. Carswell*, 159 Tex. 598, 324 S.W.2d 835 (1959), intermediate courts in this state have exercised the right of remittitur through "sound judicial judgment" since 1893. That opinion rejected the motion that the test should be "one of the sufficiency of the evidence in support of the verdict." 324 S.W.2d 835, 840.

Apparently that standard of review worked well for more than four score of years until, in 1986, the Court in a per curiam opinion determined that "[f]actual sufficiency is the sole remittitur standard for actual damages." *Pope v. Moore*, 711 S.W.2d 622 (Tex.1986). Not far behind was Justice Kilgarlin's opinion in *Larson v. Cactus Utility Company*, 730 S.W.2d 640 (Tex.1987), with which Chief Justice Hill and Justice Gonzalez chose to dissent. Justice Kilgarlin wrote "[t]rial courts and courts of appeals should be subject to the same standard for a simple reason: no court is free to substitute its judgment for that of the jury." I translate that language to mean that when there is no real standard by which to judge damages, we will tolerate an arbitrary determination by a jury but not by a trial judge or an intermediate court of appeals.

The most dramatic effect that the present rule will have is in those cases where a jury awards damages for mental anguish suffered by one family member for the wrongful death of another family member. Parents, because of a family relationship, present some evidence of mental anguish from the wrongful death of a child even when there is no testimony concerning what effect the loss of the child has on their lives. *Moore v. Lillebo*, 722 S.W.2d 683 (Tex.1986). In such a case, if a jury awards $1,000.00 or $100,000.00 or $1,000,000.00, by what standard is a question of excessiveness to be reviewed? No longer is it sound judicial discretion. Does the "family relationship" justify any or all of the figures noted above?

The issue now before this Court was noted by Professors William Powers, Jr. and Jack Ratliff in the recent article entitled *Another Look at "No Evidence" and*

"*Insufficient Evidence*", 69 Texas L.Rev. 515, 567 (1991), where they wrote:

In cases involving intangible damages, it will be difficult for appellate courts to point to specific testimony that demonstrates excessiveness (or inadequacy, for that matter). Nevertheless, common sense suggests that courts should have some authority to review excessive or inadequate damage awards. It would be unwise to permit a jury to make any award it thinks fit without limit, even though it is dealing with damages that resist exact calculation or quantification. Juries have no way to compare an award in a given case with other awards in similar cases, but judges do. Without some kind of review, the system will produce radically inconsistent awards for the same kinds of injuries and will be destined to take on more of the aspects of a lottery than it already has.

Although *Pope* did not deal with punitive damages, its rationale seems equally applicable to them. The problems concerning compensatory damages are at least equally severe in cases involving punitive damages. In both types of cases, we suggest that Texas courts should be cautious before applying *Pool* requirements to cases involving remittitur.

Again, I concur.