BURROUGHS WELLCOME
CO., Appellant,

v.

Robert N. CRYE, Independent Executor
of the Estate of Jewell K. Crye,
Appellee.

No. 08–92–00315–CV.

Court of Appeals of Texas,
El Paso.

June 23, 1994.

Rehearing Overruled July 20, 1994.

James L. Gallagher, Jeffrey S. Alley, Scott, Hulse, Marshall, Feuille, Finger & Thurmond, El Paso, for Appellant.

Joel Fry, Moreno & Fry, El Paso, for Appellee.

Before BARAJAS, C.J., and LARSEN and McCOLLUM, JJ.

## OPINION

BARAJAS, Chief Justice.

This is an appeal from a judgment rendered against Burroughs Wellcome Company, Appellant, for the sum of $500,000 plus interest and costs, following a jury trial of a products' liability case. In six points of error, Appellant attacks the trial court's judgment. We affirm the judgment of the trial court.

## I. SUMMARY OF THE EVIDENCE

This is a products' liability case arising from an alleged "frostbite" injury sustained by Mrs. Jewell Crye after using Polysporin® Spray, an over-the-counter topical antibiotic manufactured by Appellant.[1]

The record shows that Mrs. Jewell K. Crye, a severe diabetic with a history of foot ulcers, fungal infections, and diabetic neuropathy (a loss of sensation typically causing an

---

1. The subsequent death of Mrs. Crye, unrelated to the use of the product, precipitated the need for her husband Robert N. Crye to proceed as Plaintiff/Appellee.

inability to feel pain, typically present in the feet), had occasion to see a dermatologist who recommended the use of Polysporin powder for use on her foot ulcers. On or about March 4, 1987, Jewell K. Crye, having seen the spray form of the product at a local grocery store, purchased the product and applied it to an ulcer on her foot.

The morning following her first application of the spray, Mrs. Crye noticed swelling and redness to her foot where the spray had been applied. Approximately two days later, she returned to her dermatologist. On March 16, 1987, Mrs. Crye saw Dr. Cornelius Blesius, her primary care physician for over nine years, who diagnosed a thermal injury caused by the spray.

The record shows that Polysporin Spray is a successor to Neosporin® Spray, a prescription antibiotic developed in the early 1960's. The product, approved by the Food and Drug Administration and first marketed in 1985, is an antibiotic powder which is applied by an aerosol spray, using freon as its propellant. Marketing considerations led Appellant to seek approval of the product because it desired a topical antibiotic for use on minor cuts, scrapes and burns. In developing the product, Appellant removed neomycin from its Neosporin® Spray, the deletion of which was said to create no additional risks to users of the product. Knowing that the product caused some cooling of the skin, however, Appellant elected to conduct no testing to determine the existence of any possible adverse effects of temperature reduction.[2] The record does show that testing of the product was conducted in 1988, more than a year after Mrs. Crye's alleged use of the product.[3] The evidence shows that the packaging and labeling that accompanied the product at the time of purchase specified the distance at which the product was to be applied as well as the treatment, i.e., one-second intermittent sprays, one to three times daily. The record shows that the product purchased by Mrs. Crye contained labeling information which advised the consumer that the product could be dispensed in either an upright or inverted position. The packaging and labeling information was revised subsequent to Mrs. Crye's purchase of the product to reflect instructions in bold print to "hold can upright" during application of the product.[4] The evidence showed that failure to apply the product with the aerosol can in its upright position **could** cause delivery of more propellant, which in turn could cause a cooling effect and the resulting reduction in skin temperature.

The record shows that the adverse effects of the spray in combination with other conditions necessitated hospitalization for some forty-nine days, painful treatment, concerns over possible loss of the foot, and permanent impairment which forced Mrs. Crye to use a wheelchair or walker for the remainder of her life.

The jury found that design and marketing defects in the product were a producing cause of Mrs. Crye's injury, that the product was unfit for the ordinary purposes for which such sprays are used because of a defect and that such unfit condition proximately caused Mrs. Crye's injury, and that Appellant's negligence in the manufacture and sale of the product proximately caused Mrs. Crye's injuries. The jury also failed to find that any negligence of Mrs. Crye proximately caused her injury. The trial court sustained Appel-

2. The record shows that extensive testing of the product's forerunner, Neosporin Spray, was conducted for both efficacy and safety, that Appellant submitted a new drug application to Neosporin Spray to the FDA in 1963, and that Neosporin Spray was tested both clinically as well as in the laboratory. Appellant asserts that testing of Neosporin Spray would have revealed any adverse effects, including risk of frostbite. The record further shows that at the time the product was sold, no case of any thermal injury had been reported, and Appellant had never heard of or read of any such case. The propellant used in both Neosporin Spray and the product used by Mrs. Crye was the chloroflourocarbon freon, the most widely-used propellant in the world, with 400,000,000 pounds being used in a single year.

3. The record shows that the only tests conducted by Appellant on the product in 1988 dealt only with skin irritancy, not possible thermal injury.

4. The record shows that although the change in packaging and labeling information was made in December 1986, a date prior to Mrs. Crye's purchase of the spray, no effort was made to recall the improperly labeled products or otherwise notify consumers of the change.

lant's motion for judgment *non obstante veredicto* in part and disregarded the jury finding of design defect. The trial court otherwise overruled Appellant's motions for judgment *non obstante veredicto*, for new trial and, in the alternative, for remittitur, and judgment was rendered for Robert N. Crye, as Independent Executor of the Estate of his wife, Jewell K. Crye.

## II. *DISCUSSION*

In Points of Error Nos. One, Two, and Three, Appellant contends that the evidence is legally and factually insufficient to support the jury's findings of liability.

### A. Standards of Review

■ In considering a "no evidence" legal insufficiency point, we consider only the evidence which tends to support the jury's findings and disregard all evidence and inferences to the contrary. *Garza v. Alviar*, 395 S.W.2d 821 (Tex.1965). If there is more than a scintilla of evidence to support the questioned finding, the "no evidence" point fails. *Stafford v. Stafford*, 726 S.W.2d 14, 16 (Tex. 1987); *Worsham Steel Co. v. Arias*, 831 S.W.2d 81 (Tex.App.—El Paso 1992, no writ); *Fuentes v. McFadden*, 825 S.W.2d 772 (Tex. App.—El Paso 1992, no writ).

■ A factual insufficiency point, on the other hand, requires us to examine all of the evidence in determining whether the finding in question is so against the great weight and preponderance of the evidence as to be manifestly unjust. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (Tex.1951); *Oechsner v. Ameritrust Texas, N.A.*, 840 S.W.2d 131, 136 (Tex.App.—El Paso 1992, writ denied); *Chandler v. Chandler*, 842 S.W.2d 829, 832–833 (Tex.App.—El Paso 1992, writ denied). The reviewing court cannot substitute its conclusions for those of the jury. If there is sufficient competent evidence of probative force to support the finding, it must be sustained. *Oechsner*, 840 S.W.2d at 136; *Chandler*, 842 S.W.2d at 833. It is not within the province of the court to interfere with the jury's resolution of conflicts in the evidence or to pass on the weight or credibility of the witness's testimony. *Benoit v. Wilson*, 150 Tex. 273, 239 S.W.2d 792 (1951). Where

there is conflicting evidence, the jury's verdict on such matters is generally regarded as conclusive. *Montgomery Ward & Co. v. Scharrenbeck*, 146 Tex. 153, 204 S.W.2d 508 (1947); *Oechsner*, 840 S.W.2d at 136; *Chandler*, 842 S.W.2d at 833.

### B. Marketing Defect

■ In Point of Error No. One, Appellant asserts that the trial court erred in denying its motions for judgment n.o.v. and new trial in that the evidence at trial was legally and factually insufficient to support the jury's findings that the product in question was defective as marketed and that this defect was a producing cause of injury. The mere occurrence of an accident is no proof that a product is defective, nor does the fact that a product causes an injury create liability. *Accord v. General Motors Corp.*, 669 S.W.2d 111 (Tex.1984); *Hernandez v. Nissan Motor Corp.*, 740 S.W.2d 894, 895 (Tex. App.—El Paso 1987, writ denied). The plaintiff, Appellee here, bears the burden of proving by probative evidence that a supplier's product caused the plaintiff's injury and was defective in either its manufacture, design, or marketing. *Beatty v. Roper Corp.*, 714 S.W.2d 376, 378 (Tex.App.—Corpus Christi 1986, writ ref'd n.r.e.). A marketing defect consists of (1) the failure to warn of dangers or risks of harm from the use of a product; (2) the failure to warn adequately of such dangers or risks of harm; (3) the failure to provide instructions for safe use of the product; or (4) the failure to provide adequate instructions for safe use of the product. *Bristol–Myers Co. v. Gonzales*, 561 S.W.2d 801, 803–04 (Tex.1978); *Technical Chem. Co. v. Jacobs*, 480 S.W.2d 602, 604–05 (Tex.1972); *Lujan v. Tampo Mfg. Co., Inc.*, 825 S.W.2d 505, 510 (Tex.App.—El Paso 1992, no writ).

■ The duty to provide warnings or instructions for safe use of a product arises only when the product is established to be unreasonably dangerous in the absence of such warnings or instructions. *Rodriguez v. Universal Fastenings Corp.*, 777 S.W.2d 513, 517 (Tex.App.—Corpus Christi 1989, no writ); *Johnson v. Jones–Blair Paint Co.*, 607 S.W.2d 305, 306 (Tex.App.—Eastland 1980,

writ ref'd n.r.e.). This duty to provide warnings or instructions also requires, as a predicate, that the danger or risk of harm be either known or reasonably foreseeable by the product supplier at the time of marketing. *Bristol–Myers Co.*, 561 S.W.2d at 804; *USX Corp. v. Salinas*, 818 S.W.2d 473, 483–84 (Tex.App.—San Antonio 1991, writ denied); *Williams v. Southern Pac. Transp. Co.*, 804 S.W.2d 132, 138 (Tex.App.—Houston [1st Dist.] 1990, writ denied); *Dixon v. Van Waters and Rogers, a Division of Univar Co.*, 674 S.W.2d 479, 481 (Tex.App.—Fort Worth 1984, writ ref'd n.r.e.). The basis for requiring a product supplier to provide warnings or instructions for safe use is the policy that the consumer is entitled to all available relevant information in order to make an informed, intelligent choice in selecting a product. The consumer must also be afforded the opportunity to weigh the utility of the product against the extent and degree of the potential risk of harm involved with its use. *See Joseph E. Seagram & Sons, Inc. v. McGuire*, 814 S.W.2d 385, 387–88 (Tex.1991). A supplier is not **automatically** relieved of its duty to warn of risks that potentially affect only a limited number of users idiosyncratically susceptible to a danger in the product. *Crocker v. Winthrop Lab., Div. of Sterling Drug, Inc.*, 514 S.W.2d 429, 432 (Tex. 1974).

### 1. Adequacy of Warnings

 Examining only the evidence in the instant case that tends to support the jury's findings of a marketing defect and disregarding all evidence and inferences to the contrary, we note that the record shows that the product, in aerosol form, was first marketed in 1985, using freon as its propellant. From its initial date of marketing, although it was known to cause some cooling of the skin, no testing was conducted to determine the existence of any possible adverse effects of temperature reduction. The record shows that no testing of product was ever performed until 1988, approximately two years after Mrs. Crye's alleged use of the product.[5] Also, the packaging information accompanying the product contained no warnings concerning the potential dangers from the use of the product with regard to temperature reduction of the skin.

 Further, although the Polysporin spray was intended for use on minor cuts, scrapes, and burns, Appellant should have been aware that Polysporin powder was commonly used and/or prescribed to treat foot ulcers in diabetic patients. Since the active ingredients in the powder and spray forms of the product are identical, it should have been foreseeable to Appellant that the spray form of the product might also be used to treat such foot ulcers. It is well settled in Texas that a product supplier is held to the standard of an expert concerning the product. *Bristol–Myers Co.*, 561 S.W.2d at 804. As such, Appellant should have been aware of the decrease of sensation in the extremities commonly experienced by diabetic patients. The cooling effect of the freon propellant, combined with this known loss of sensation in the extremities of diabetic patients, magnified the risk that application of an excess amount of freon could cause an undetected temperature reduction in the foot of a diabetic user, causing a thermal injury. It is the opinion of this Court that this evidence is legally sufficient to support the jury's findings that the Polysporin spray was defectively marketed.

 An examination of all of the evidence reveals that prior to this incident, Appellant had received no reports of thermal injuries from the use of the spray. The record further reveals that Appellant, as required by the FDA, submitted the specific labeling for both the Neosporin and Polysporin sprays to the agency for its review and approval. Neither product would have been approved by the FDA had that agency concluded that the labeling on the product was in any way inadequate. Compliance with government standards does not establish that a warning accompanying a product is adequate as a matter of law. *Bristol–Myers Co.*, 561 S.W.2d at 804. Such compliance

---

**5.** The record shows that the tests conducted in 1988 dealt only with skin irritancy, not possible thermal injury.

does, however, constitute strong and substantial evidence that a warning is not defective or inadequate. *Lorenz v. Celotex Corp.,* 896 F.2d 148 (5th Cir.1990). Finally, no expert witness testified that frostbite was a known or reasonably foreseeable risk based upon all scientific information available to Appellant at the time it supplied the product in question; however, it is not necessary to demonstrate foreseeability of the exact injury sustained or exactly how the injury would occur. *Southwest Forest Indus., Inc. v. Bauman,* 659 S.W.2d 702, 704 (Tex.App.—El Paso 1983, writ ref'd n.r.e.).

When all of the evidence is examined, it is the opinion of this Court that factually sufficient evidence supports the jury's finding that the Polysporin spray was defectively marketed. Although the FDA approved the product's labeling and no expert witness proclaimed the warnings to be inadequate, Appellant was aware of the cooling effect the freon propellant has on skin. Also, since Appellant is held to the standard of an expert, Appellant knew or should have known of the particular risks associated with their diminished sensation faced by diabetic users of the product. Sufficient evidence of probative force exists to support the conclusion that the cooling effect of the freon propellant, combined with the known decrease of sensation in the extremities of diabetic patients, created a risk that application of an excess amount of freon could cause an undetected temperature reduction in the foot of a diabetic user.

### 2. Adequacy of Instructions

◼ The record in the instant case reveals that the only instructions for proper use of the product included in the product's labeling read as follows:

Clean the affected area. SHAKE WELL before each spraying. Remove cap and press button to spray affected area. Container will operate in either upright or inverted position. Use one-second intermittent sprays from a distance of about eight inches. Prolonged spraying is un-

necessary and wastes medication. Apply a small amount of this product one to three times daily. May be covered with a sterile bandage.

These instructions specify the distance at which the product is to be applied as well as the treatment, i.e., one-second intermittent sprays. These instructions, however, fail to indicate the appropriate number of sprays; the product user is left to determine a number of sprays that is sufficient to effectuate treatment without wasting the medication through over-application. The record also shows that Mrs. Crye testified at her deposition that she applied the product once in accordance with the packaging and labeling instructions.

The record shows that the product purchased by Mrs. Crye contained labeling information which advised the consumer that the product could be dispensed in either an upright or inverted position. The packaging and labeling information was revised subsequent to Mrs. Crye's purchase of the product to reflect instructions in bold print to "hold can upright" during application of the product.[6] The evidence showed that failure to apply the product with the aerosol can in its upright position could cause delivery of more propellant, i.e., freon, which in turn could cause a cooling effect and the resulting reduction in skin temperature.

Examining this evidence in the light most favorable to the jury's verdict, we conclude that more than a scintilla of evidence exists supporting the jury's finding of a marketing defect. As discussed above, Appellant should have been aware of the potential dangers to diabetic users of the spray, and the failure to more clearly specify the amount of product to be used, as well as the instruction that the can could be safely used in an inverted position, magnified this danger. Further, the inclusion of the instruction that prolonged spraying is unnecessary shows Appellant's awareness of the foreseeable, if not common, over-application of the product by its users. The record shows that a represen-

---

**6.** The record shows that although the change in packaging and labeling information was made in December 1986, a date prior to Mrs. Crye's pur-

chase of the spray, no effort was made to recall the improperly labeled products or otherwise notify consumers of the change.

tative of Appellant testified to this fact at trial.

After reviewing all of the evidence, we again note that while the absence of expert testimony proclaiming the inadequacy of the instructions and the FDA approval of the packaging and labeling is some evidence that the included instructions were adequate, such factors are not conclusive. It is the opinion of this Court, in light of all of the evidence, that the jury's finding of a marketing defect is likewise supported by factually sufficient evidence.

### 3. Producing Cause

In a personal injury case, causation consists of two distinct aspects. The plaintiff must prove that the conduct of the defendant caused an event and that this event caused the plaintiff to suffer injuries for which compensation in damages should be paid. *See Morgan v. Compugraphic Corp.*, 675 S.W.2d 729, 731 (Tex.1984). Thus, at trial the plaintiff must establish two causal nexuses in order to be entitled to recovery: (a) a causal nexus between the defendant's conduct and the event sued upon; and (b) a causal nexus between the event sued upon and the plaintiff's injuries. *Id.*

In the instant case, it is undisputed that the conduct of Appellant caused the event sued upon—the absence of adequate warnings and instructions included in the packaging and labeling of the Polysporin spray. The issue is whether sufficient competent evidence establishes that a causal nexus exists between this event sued upon and Mrs. Crye's injuries.

The level of causation the plaintiff is required to establish in a products' liability case is producing cause. *USX Corp.*, 818 S.W.2d at 482–83. Producing cause is defined as "an efficient, exciting or contributing cause, which in a natural sequence, produced the complained-of injuries or damages." *Gutierrez v. Dresser Indus., Inc.*, 769 S.W.2d 704, 706 (Tex.App.—Corpus Christi 1989, no writ). The defect, while it may be a contributing cause, need not be the only producing cause. *General Chem. Corp. v. De La Lastra*, 815 S.W.2d 750, 756 (Tex.App.—Corpus Christi 1991, no writ); *Simms v. Southwest Texas Methodist Hosp.*, 535 S.W.2d 192, 197 (Tex.Civ.App.—San Antonio 1976, writ ref'd n.r.e.).

The record in the instant case shows that Mrs. Crye suffered from an ulcer on her foot for approximately six months. Dr. Peter S. Herman, a dermatologist, recommended treatment with Polysporin® Powder, an over-the-counter product. She saw Polysporin Spray at a local grocery store and purchased the product for use on her ulcer. The evidence shows that she applied the product once in accordance with the packaging and labeling instructions. The next morning, her foot was very swollen and was inflamed everywhere the product had been applied. An infection developed after her use of the product. As a result, she returned to Dr. Herman who recommended that the product be discontinued. The record further shows that Mrs. Crye sought the advice of Dr. Cornelius Blesius, her primary care physician, who immediately diagnosed frostbite and concluded that she had sustained a thermal injury due to use of the product. Mrs. Crye was admitted into Southwestern General Hospital in El Paso where the admitting diagnosis was cellulitis and frostbite of the left foot.

Appellant contends that the only evidence supplying a causal nexus between the inadequate warnings and instructions and Mrs. Crye's injuries was the testimony of Dr. Blesius. Appellant further contends that the opinions of Dr. Blesius are not supported by the evidence and cannot support a jury award. Appellant's contention centers on the assertion that Dr. Blesius' diagnosis of frostbite cannot be reconciled with the undisputed facts of the case, and Mrs. Crye did not suffer from a thermal injury caused by the Polysporin spray.

As discussed above, the evidence in the instant case regarding Mrs. Crye's injuries and the causes thereof shows that Dr. Herman, a board-certified dermatologist, diagnosed foot ulcers with fungal infections on both feet and prescribed Polysporin powder in October of 1986. Several months later, however, Mrs. Crye purchased and used the Polysporin spray on the affected areas of her

feet. The morning after her use of the spray, Mrs. Crye's foot was very swollen and inflamed everywhere the product had been applied. She returned to Dr. Herman who again diagnosed an infection and prescribed medication to combat the infection. Several days later, Mrs. Crye saw Dr. Blesius, her primary care physician. Dr. Blesius' diagnosis of Mrs. Crye's foot problem was a thermal injury, frostbite, caused by the spray. This diagnosis was based on the lack of redness in the foot common to infections and the existence of a piece of dead skin in the web of her foot next to her big toe. Mrs. Crye was subsequently hospitalized, and the hospital admission records confirmed Dr. Blesius' diagnosis of frostbite.

The record shows that Dr. Blesius testified, however, that if the foot had been red and swollen when Mrs. Crye first saw Dr. Herman after using the spray, his diagnosis may have been different. He further testified that since Mrs. Crye saw Dr. Herman soon after using the spray, Dr. Herman was in a better position to diagnose the possibility of a thermal injury, although he may not have been thinking about that type of injury at that time. Dr. Herman then testified that when he saw Mrs. Crye at that time, he noted that her foot was swollen and infected and diagnosed intertrigo, a moist inflammation, of the toe web area. He further testified that he had treated frostbite before and was competent to recognize and diagnose that condition, but that he did not see anything that led him to believe that Mrs. Crye had sustained a thermal injury to her foot.

As discussed above, the record shows that Mrs. Crye testified that the ulcer on her foot was not infected immediately before she used the spray, but that she woke up the next morning and her foot was very swollen. Mr. Crye also testified that the condition of her toe after using the spray was unlike the sores and ulcers she had previously experienced as a result of her diabetes.

Examining this evidence in the light most favorable to the jury's verdict, we conclude that more than a scintilla of evidence exists supporting the jury's finding of producing cause. Both Mr. and Mrs. Crye testified that the condition of her foot immediately after using the spray was quite different from the usual problems she had suffered as a result of her diabetes. Also, after his initial examination of Mrs. Crye after she used the spray, Dr. Blesius diagnosed a thermal injury caused by the spray.

After reviewing all of the evidence, we note that Dr. Herman testified that he did not observe any kind of thermal infection. Likewise, the record shows that another of Appellant's expert witnesses, Dr. Ratner, testified that based on the medical reports and other information provided to him from Dr. Herman and Dr. Blesius, he did not believe that Mrs. Crye had suffered a thermal injury or that the Polysporin spray had anything medically significant to do with her foot problem.

As stated above, however, it is not within the province of this Court to interfere with the jury's resolution of conflicts in the evidence or to pass on the weight or credibility of the witness's testimony. *Benoit,* 239 S.W.2d at 796–97. Therefore, giving due respect to the jury's evaluation of the credibility of the competing expert witnesses, it is the opinion of this Court that the jury's finding of producing cause is supported by factually sufficient evidence.

Based on the above, we hold that there is both legally and factually sufficient evidence that the instructions and warnings included in the packaging of the Polysporin spray were inadequate, and that these inadequate instructions and warnings were a producing cause of Mrs. Crye's injuries. The trial court, therefore, did not err in denying Appellant's motions for judgment n.o.v. and new trial. Accordingly, Appellant's Point of Error No. One is overruled.

The record in the instant case shows that in addition to the jury's finding of a marketing defect that was a producing cause of Mrs. Crye's injuries, the jury also found that the Polysporin spray was unfit for the ordinary purposes for which it was to be used and that Appellant was negligent in the design, manufacture, or marketing of the spray, and that both of these were a proximate cause of Mrs. Crye's injuries. In Points of Error Nos. Two and Three, Appellant challenges the legal and factual sufficiency of the evidence sup-

porting these findings. However, the damage question submitted to and answered by the jury reads as follows:

What sum of money, if any, if paid now in cash, would fairly compensate JEWELL K. CRYE for her damages, if any, for which Polysporin spray was the producing or proximate cause. Consider each element of damages separately. Do not reduce the amounts for the negligence of JEWELL K. CRYE, if any.

 a. Physical pain and mental anguish

 b. Physical impairment

 c. Medical care

Answer in dollars and cents:

**ANSWER: $500,000.00**

This question does not ask the jury to itemize the damages from each theory of recovery, and any of the theories of recovery will support an award of the full amount of damages found by the jury. Therefore, given our disposition of Point of Error No. One upholding the jury's verdict on the marketing defect issue, we need not address and thus overrule Points of Error Nos. Two and Three.

### C. Contributory Negligence

In Point of Error No. Four, Appellant contends that the trial court erred in denying its motion and amended motions for new trial because the jury's refusal to find that Jewell K. Crye was negligent and that her negligence was a proximate cause of her injuries are contrary to the overwhelming, great weight and preponderance of the evidence. Appellant, defendant below, had the burden to prove at trial that Appellee was negligent and that her negligence was a proximate cause of her injuries. The jury's refusal to find that Appellee was so negligent is reviewable by the standard of review for factual sufficiency of evidence set out in *In re King's Estate,* 150 Tex. at 664, 244 S.W.2d at 661. *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986).

██ The negligence of a plaintiff is determined by the plaintiff's use of ordinary care in view of what a reasonable person would have done in the same or similar circumstances. In the instant case, Appellant focuses on Mrs. Crye's actions with regard to the use of the spray and the care of her feet in support of its allegations of negligence.

██ The record shows that Mrs. Crye received extensive instructions on the care of her feet and the importance of such care from her doctors. Appellant asserts that her repeated violations of these instructions amount to a failure to exercise ordinary care and that this failure was the proximate cause of her injuries. Appellant specifically points to the following actions by Mrs. Crye to establish her negligence:

(1) Although she was specifically told to put nothing on her feet without a doctor's prior approval, she used the spray before consulting a doctor;

(2) Even after she experienced a problem with her foot, she tried another medication *without doctor approval;*

(3) Although she was told of the need to be under the care of a podiatrist, she was not;

(4) Although she was instructed to see a doctor immediately if foot problems developed, she delayed for a number of months before returning to Dr. Herman after her foot did not heal properly and waited several days to seek medical attention after her foot became red and painful in March of 1987.

The record also shows, however, that Dr. Herman advised Mrs. Crye to purchase and use Polysporin Powder on her feet. Dr. Herman informed Mrs. Crye that the active ingredient of the powder needed to come into contact with the sore on her foot. Polysporin Spray contains the exact same active ingredient as the powder version. As Appellee points out in his brief, the jury reasonably could have concluded from this evidence that the spray was purchased and used in order to fulfill Dr. Herman's instructions. Such a conclusion supports the jury's refusal to find negligence on the part of Mrs. Crye for the purchase and use of the spray.

The remainder of Appellant's evidence that Mrs. Crye did not properly take care of her feet, even if uncontroverted by Appellee, does not conclusively establish that she was negligent as a matter of law. The jury, then, was left to determine whether Appellant met

its burden of proving by a preponderance of the evidence that such actions amounted to a failure by Mrs. Crye to use ordinary care in view of what a reasonable person would have done in the same or similar circumstances. By refusing to find that Mrs. Crye was negligent, the jury determined that Appellant did not meet this burden. We decline to now hold that the jury's answer is so against the great weight and preponderance of the evidence as to be manifestly unjust. *See Pool,* 715 S.W.2d at 635.

Finally, Appellant asserts that in order for the jury to find that a frostbite injury occurred, it must have found that Mrs. Crye misused the spray. Misuse of the spray, Appellant contends, is the only way in which it is even remotely conceivable that such an injury could occur. There was, however, evidence that Mrs. Crye did not misuse the spray or that if she did, such misuse was foreseeable by Appellant. The ambiguous language of the instructions regarding the number of intermittent sprays that should be used, would allow the jury to reasonably find that Mrs. Crye was not negligent in "over-application" of the spray. Additionally, Mrs. Crye's diabetic condition made it less likely that she would have felt a significant temperature reduction as she was applying the spray, signalling her to stop spraying.

Given the above, it is the opinion of this Court that the jury's refusal to find that Mrs. Crye was negligent was not so against the great weight and preponderance of the evidence as to be manifestly unjust. Accordingly, Appellant's Point of Error No. Four is overruled.

### D. Remittitur

In Point of Error No. Five, Appellant contends that the trial court erred in denying its motion and amended motions for new trial and, in the alternative, for remittitur because the evidence was factually insufficient to support the jury's award for damages. The jury awarded Mrs. Crye $500,000 for her physical pain and mental anguish, physical impairment, and medical care resulting from her injuries. The $500,000 was not broken down into the individual elements of damages.

■ Mrs. Crye had suffered from foot ulcers for years before she used the Polysporin Spray. These earlier problems, however, had never been so serious as to require hospitalization. Immediately after her use of the spray, Mrs. Crye's pain developed and continued throughout her hospitalization and until her death. Also, the record shows that Mrs. Crye had no physical limitations in terms of walking or mobility before her use of the spray, but after her injury she possessed only a limited range of motion and required mechanical assistance to walk until the time of her death. While in the hospital, Mrs. Crye faced serious concerns about the possible loss of her foot, and the physical pain and impairment directly affected her in her ability to work and lead a normal life, resulting in additional mental anguish.

■ The record shows that the jury heard evidence that Mrs. Crye's hospital bills relating to the injuries to her foot totalled $36,000. We are of the opinion that this evidence, coupled with the evidence of her physical pain, mental anguish, and physical impairment, is factually sufficient to support the jury's award of $500,000. "Once the existence of some amount of mental anguish has been established, the incalculable quantity cannot logically be refuted or shown to be factually insufficient because there are no objective facts to calibrate measurement." *State Farm Mut. Auto. Ins. Co. v. Zubiate,* 808 S.W.2d 590, 601 (Tex.App.—El Paso 1991, writ denied); *Daylin, Inc. v. Juarez,* 766 S.W.2d 347, 352 (Tex.App.—El Paso 1989, no writ); *Brown v. Robinson,* 747 S.W.2d 24, 26 (Tex.App.—El Paso 1988, no writ). The jury's determination of the amount awarded is necessarily an arbitrary process, as the intrinsic values of physical pain and mental anguish cannot be extrinsically quantified. *Zubiate,* 808 S.W.2d at 601; *Brown,* 747 S.W.2d at 26. In light of the discretion given to the jury in setting the amount, this Court is not free to substitute its judgment for that of the jury. *Larson v. Cactus Utility Co.,* 730 S.W.2d 640, 641 (Tex. 1987); *Zubiate,* 808 S.W.2d at 601; *Brown,* 747 S.W.2d at 26.

A granting of a new trial or remittitur is proper only if the evidence is factually insuf-

ficient to support the verdict. *Larson,* 730 S.W.2d at 641; *Pope v. Moore,* 711 S.W.2d 622 (Tex.1986); *Zubiate,* 808 S.W.2d at 605; TEX.R.CIV.P. 324. Given the above, we now hold that the jury's award of $500,000 is supported by factually sufficient evidence. Accordingly, Appellant's Point of Error No. Five is overruled.

### E. The "Pig's Foot" Study

Finally, in Point of Error No. Six, Appellant contends that the trial court erred in admitting into evidence the testimony of H.R. Fuentes and his report of testing of aerosol products.

■ Admission or exclusion of evidence is a matter within the trial court's discretion. *Syndex Corp. v. Dean,* 820 S.W.2d 869, 873 (Tex.App.—Austin 1991, writ denied); *Dudley v. Humana Hosp. Corp.,* 817 S.W.2d 124, 126 (Tex.App.—Houston [14th Dist.] 1991, no writ). To obtain a reversal of a judgment based upon a trial court's decision to admit or exclude evidence, the Appellant must show: (1) that the trial court abused its discretion in making the decision; and (2) that the error was reasonably calculated to cause and probably did cause rendition of an improper judgment. *Gee v. Liberty Mut. Fire Ins. Co.,* 765 S.W.2d 394 (Tex.1989); TEX.R.APP.P. 81(b). The Texas Supreme Court has recognized that it is impossible to prescribe a specific test for making the latter determination, and calls it a "judgment call entrusted to the sound discretion and good senses of the reviewing court." *Lorusso v. Members Mut. Ins. Co.,* 603 S.W.2d 818, 821 (Tex.1980). This judgment call must be made by an evaluation of the whole case. *Id.*

■ The evidence in question in the instant case is a report of an experiment conducted by Dr. H.R. Fuentes, a civil engineer specializing in environmental engineering, and Fuentes' related deposition testimony. The experiment consisted of Fuentes applying several different types of antibiotic sprays, including Polysporin spray, to a dead pig's foot and measuring and comparing the changes in temperature of the pig's foot at the surface and at two depths below the surface. The temperature readings were obtained by inserting a thermocouple probe, a

highly temperature-sensitive piece of metal, into the pig's foot to record the temperature below the surface. Dr. Fuentes testified during his deposition that the main objective of the tests was not to measure the actual temperature reduction of human skin from the application of the sprays, but was only to see if there was any possible change in temperature caused by the sprays, and that the conclusions from the study cannot be extrapolated to human feet. He further testified that of all the sprays tested, the Polysporin spray caused the greatest temperature reduction in the metal thermocouples.

Appellant argues that for an out-of-court experiment to be admissible, there must be substantial similarity between conditions existing at the time of the occurrence and those existing at the time the experiment is conducted. *Fort Worth & Denver Ry. Co. v. Williams,* 375 S.W.2d 279, 281–82 (Tex.1964); *Wells v. HCA Health Servs. of Texas,* 806 S.W.2d 850, 853 (Tex.App.—Fort Worth 1990, writ denied). Appellant asserts that the multiple and substantial differences in the conditions of Mrs. Crye's use of the spray and Dr. Fuentes' experiment clearly resulted in error by the trial court in admitting this evidence.

Appellee points out, however, that Dr. Fuentes' study was not meant to be a reconstruction of Mrs. Crye's use of the product. As Dr. Fuentes testified during the deposition, the main objective of the tests was not to measure the **actual** temperature reduction of human skin from the application of the sprays, but was only to see if there was any **possible** change in temperature caused by the sprays, and the conclusions from the study cannot be extrapolated to human feet. As such, the cases cited by Appellant standing for the proposition that in order for the results of an experiment to be admissible there must be substantial similarity in conditions are not exactly on point. *See also Lopez v. City Towing Assocs., Inc.,* 754 S.W.2d 254, 257–58 (Tex.App.—San Antonio 1988, writ denied) (holding that videotape **reenactment** of an accident was properly excluded because of substantial differences in conditions).

In the instant case, the comparative discrepancies between Mrs. Crye's use of the

product and Dr. Fuentes' pig's foot study were clearly explained to the jury. Such discrepancies go to the credibility and weight to be given by the jury to Dr. Fuentes' testimony and experiment and not to its admissibility. *Garza v. Cole*, 753 S.W.2d 245, 247 (Tex.App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.). Given the above, it is the opinion of this Court that the trial court did not err or abuse its discretion in admitting Dr. Fuentes' study and testimony into evidence.

█ Even assuming, *arguendo*, that the evidence was incorrectly admitted, the error will not require a reversal unless it amounts to such a denial of rights of the appellant that it was reasonably calculated to cause and probably did cause rendition of an improper judgment. *Gee*, 765 S.W.2d at 396; Tex.R.App.P. 81(b)(1). It has been held that when the evidence is sharply conflicting and the case is hotly contested, any error of law by the trial court will be reversible error under Rule 81(b)(1). *Lorusso*, 603 S.W.2d at 821; *Nix v. H.R. Management Co.*, 733 S.W.2d 573, 576 (Tex.App.—San Antonio 1987, writ ref'd n.r.e.) (reversing hotly contested case for erroneous admission of evidence). But the Supreme Court has also stated that errors in admitting evidence will not require reversal unless that evidence controlled the judgment. *Gee*, 765 S.W.2d at 396. If other competent evidence of the fact in question appears in the record, improper admission of evidence will not constitute reversible error. *Id.* at 397. Another way of phrasing this is that evidentiary rulings will not cause reversal unless the appellant shows that the whole case turns on the evidence improperly admitted or excluded. *Superior Derrick Services v. Anderson*, 831 S.W.2d 868, 876 (Tex.App.—Houston [14th Dist.] 1992, writ denied); *Shenandoah Assoc. v. J & K Properties, Inc.*, 741 S.W.2d 470, 493 (Tex.App.—Dallas 1987, writ denied).

█ In the instant case, Appellant asserts that the results of the pig's foot study and the deposition testimony of Dr. Fuentes were the only evidence of temperature reduc-tion from the use of the Polysporin spray and was not cumulative of any other evidence. We disagree. As discussed above, a representative of Appellant company testified that Appellant was aware that the freon propellant in the spray did in fact have a cooling effect on the skin of the user, so Dr. Fuentes' study was not the only evidence that the spray could cause a temperature reduction. Further, Appellant's counsel vigorously cross-examined Dr. Fuentes during his deposition and questioned him about the dissimilarities between his pig's foot study and the actual effects on human skin. Appellant's counsel also emphasized these matters in his argument to the jury. We are confident that the jury was able to evaluate and place this evidence in proper perspective. Therefore, after reviewing the entire record, it is the opinion of this Court that Dr. Fuentes' study and testimony did not control the judgment and that the whole case did not turn on that evidence. However, while the testimonial evidence of Dr. Fuentes served to demonstrate a temperature reduction of human skin from the application of the sprays, such evidence is insufficient to establish a design defect.

Given the above, we hold that the trial court did not err or abuse its discretion in admitting the pig's foot study and Dr. Fuentes' related testimony into evidence. We further hold that even if such admission was error, it was harmless under Tex. R.App.P. 81(b)(1). Accordingly, Appellant's Point of Error No. Six is overruled.

█ In sole cross-point, Appellee complains of the trial court's error in disregarding the jury finding of a design defect.[7] In order to establish a design defect, evidence must demonstrate that the risk involved in the use of a product outweighs its utility to such an extent that it is reasonably dangerous. *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61 (Tex.1983); *Boatland of Houston, Inc. v. Bailey*, 609 S.W.2d 743, 746 (Tex. 1980). In that regard, Texas law does not require a product manufacturer to produce a perfect product, nor incorporate every possible safety feature. *McCants v. Salameh*, 608 S.W.2d 304 (Tex.Civ.App.—Waco 1980, writ ref'd n.r.e.). Moreover, proof of a better

7. On review, Appellee advanced two cross-points, the first addressed above. Cross–Point No. Two, in which Appellee moved this Court to dismiss the appeal for want of jurisdiction, was denied on November 18, 1992, thereby rendering it moot.

design alone is insufficient to support a jury finding of a design defect since almost any product could be designed better in some fashion. *Henderson v. Ford Motor Co.,* 519 S.W.2d 87 (Tex.1974).

Appellee, citing *Arch Construction, Inc. v. Tyburec,* 730 S.W.2d 47, 51 (Tex.App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.), correctly notes that a trial judge should disregard a jury finding only when there is "no evidence" to support the finding. Accordingly, we consider only the evidence which tends to support the jury's findings and disregard all evidence and inferences to the contrary. *Garza v. Alviar,* 395 S.W.2d 821 (Tex.1965). In so doing, with the exception of the testimony of Dr. Fuestes detailed above, we find the evidence to be legally insufficient to support the questioned finding. *See Stafford,* 726 S.W.2d at 16. Consequently, we find that the trial court did not error in disregarding the jury finding of design defect, and overrule Appellee's first cross-point.

Having overruled Appellant's Points of Error Nos. One through Six, as well as Appellee's sole remaining cross-point, we hereby affirm the judgment of the trial court.